500 A.2d 315

**COMPTROLLER OF the TREASURY**

v.

**SHELL OIL COMPANY.**

**No. 290, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Nov. 15, 1985.

Gerald Langbaum, Asst. Atty. Gen. of Annapolis, (Stephen H. Sachs, Atty. Gen. of Baltimore, and John K. Barry, Asst. Atty. Gen. of Annapolis, on the brief), for appellant.

John S. Nolan, Washington, D.C. (Miller & Chevalier, Washington, D.C., Chartered on the brief), for appellee.

Argued before WILNER and BISHOP, JJ., and GETTY, JAMES S., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

WILNER, Judge.

This appeal arises from a disagreement between the Comptroller of the Treasury and Shell Oil Company over the amount of Maryland corporate income taxes owed by Shell for the years 1976, 1977, and 1978. At issue is whether royalties paid by Shell under certain leases for oil and gas producing properties constituted "gross rent," as defined in one of the Comptroller's regulations—COMAR 03.04.01.03E(4)(a).

In its tax returns for the years in question, Shell treated the royalty payments as gross rent; the Comptroller disputed that treatment, recalculated Shell's taxes on the premise that the royalties were not in the nature of gross rent, and levied an assessment for the additional taxes he

claimed were due. Shell appealed to the Maryland Tax Court which, without making any specific findings of its own as to the nature of these royalties, sustained the assessments on the basis that the Comptroller had a statutory discretion to disallow the royalties as gross rent. The Circuit Court for Baltimore City, upon Shell's further appeal, held that the royalties *did* constitute gross rent as defined in the regulation and thus reversed the Tax Court. The Comptroller is now aggrieved and brings this appeal to us.

Shell, a Delaware corporation, is an integrated oil company. Its principal business is the exploration for and development, production, purchase, transportation, and marketing of crude oil and natural gas, as well as the purchase, manufacture, and marketing of oil and chemical products. Most of that activity takes place outside of Maryland. Within this State, Shell's principal business consists of marketing oil and chemical products.

The parties agree that the portion of Shell's total business income that may be allocated to Maryland for purposes of the State corporate income tax is to be determined by the three-factor formula provided for in Md.Code Ann. art. 81, § 316(c), as that statute read during the years in question.[1] In summary, the percentage of Shell's total business income allocable to Maryland is determined by averaging three fractions:

(1) Shell's property in Maryland/Shell's total property;

(2) Shell's payroll in Maryland/Shell's total payroll; and

(3) Shell's sales in Maryland/Shell's total sales.

*See Xerox Corp. v. Comptroller,* 290 Md. 126, 130, 428 A.2d 1208 (1981).

We are concerned here with the first of these factors, in particular, the valuation of property acquired by Shell for the purpose of exploring for and extracting oil and gas.

---

**1.** Section 316 was amended by 1984 Md.Laws, ch. 294. All references to that section in this Opinion are to the statute as it stood in 1976–78.

Potential oil and gas producing properties are normally acquired either by outright purchase or by lease.[2]  We are interested in the properties acquired by lease.

Three representative samples of Shell's leasing agreements are in evidence.  Together with other evidence, they show that the leasing arrangements entered into by Shell generally provide for three types of consideration to be paid by Shell to its lessors: a lease bonus, a "delay" rental, and a royalty.  The lease bonus, which is not mentioned in the lease itself, is a lump sum payment made to the lessor upon execution of the lease or at some agreed upon time thereafter.  The amount of the bonus varies according to the parties' assessment of the land's potential for oil or gas production, but, according to the evidence, it is determined in tandem with the amount of royalty to be paid.

"Delay" rent is a payment made to extend a lease of non-producing land, to avert a premature termination of the lease.  Shell's typical oil and gas lease requires it to commence drilling within a prescribed period—usually within one year after execution of the lease—and provides that, if drilling has not begun within that period, the lease will terminate unless Shell pays the "delay" rent to the lessor.  These payments, then, are not obligatory unless Shell desires to delay drilling operations beyond the time called for in the lease.

The third mode of consideration—royalties—involves payments made at designated intervals based on the amount of oil or gas extracted from the land.  As noted, the amount of royalty is usually negotiated in conjunction with the amount of lease bonus, but it generally hovers between $\frac{1}{8}$ and $\frac{1}{6}$ of production.  Most oil royalties are payable either in cash or

---

**2.** When choosing to purchase rather than lease, Shell sometimes purchases the entire fee simple estate including surface rights and sometimes purchases only the mineral rights.

in kind (*i.e.*, a portion of the oil extracted), at the lessee's option;[3] gas royalties are normally paid in cash.

How should Shell's interest in these leased properties be valued for purposes of § 316(c)?[4] Shell looks to COMAR 03.04.01.03E(4)—the Comptroller's own regulation, promulgated pursuant to the general authority conferred by Md. Code Ann. art. 81, § 304(a). That regulation provides, essentially, for "leased or rented property" to be valued by capitalizing the annual rent by a factor of eight. It states, in relevant part:

> "(a) In determining the capitalized value of rented or leased property includible in the property factor and as described above, the term 'leased or rented property' shall include property held by the taxpayer where the legal relation between the parties is that of 'Landlord and Tenant', whether that property be held under a gross lease, net lease, percentage lease, or a lease of similar purport. The term 'Gross Rent' shall include payments made by a tenant for the privilege of occupying or using the property, including such items as fixed rent, percentage rent, real estate taxes, insurance and maintenance expense borne by the tenant. The term does not include utilities such as gas, electricity, oil, water or items normally consumed by the tenant.
>
> (b) The term 'Capitalized Value', for the purpose of these regulations, shall mean a value determined by multiplying the 'Gross Rent', as defined in these regulations by eight...."

Shell contends that the properties in question are "leased" and that the royalty payments are a form of "percentage rent." In its returns for the three years at issue, it valued the leased properties by adding to the lease

---

3. In its brief, Shell contends that the option is the lessor's; the representative leases placed into evidence, however, show that the option is that of the lessee.

4. Section 316(c) made clear that "the property factor shall include rented as well as owned property...." *See also* COMAR 03.04.01.-03E(1).

bonus payments either eight times the "delay" rental payments made during the respective tax years, in the case of non-producing properties, or eight times the royalty payments made during those respective years, in the case of producing properties. The Comptroller apparently accepted the inclusion of the lease bonus payments with respect to producing property but (1) disallowed such payments as to non-producing property as well as all "delay" rent, on the ground that non-producing property should not be included in calculating the property factor, and (2) disallowed the capitalization of the royalty payments. Because all of the property in question was located outside of Maryland, the effect of these disallowances was to reduce only the denominator of the co-equal property fraction. That served to increase the amount of Shell's aggregate business income allocable to Maryland and thus to increase, by a total of $129,312, Shell's corporate income tax for the three years.

The theory espoused by the Comptroller in rejecting a capitalization of royalty payments was, and is, that such payments do not constitute rent. His argument is somewhat confusing. At times, he seems to regard the transaction between Shell and its lessors as not being the conveyance of a leasehold interest in the land, but rather a sale of the minerals being extracted. Under this approach, the property to be valued is not the interest in the land, but the minerals themselves. As stated in his brief before us,

"[T]he Comptroller analogized the royalty payment to an amount paid for the purchase of oil and gas, and allowed the inclusion of the royalty in Shell's property factor at its cost, in much the same fashion that any other purchased property, including inventory, such as oil and gas purchased on the open market, cranes, drills and office equipment, would be includable at cost."

At oral argument, he seemed to acknowledge that the property to be valued *was* the leasehold interest in the land, but contended that the measure of its value was the worth of the minerals extracted.

The Tax Court, though agreeing that abandoned property should not be included in calculating the property factor, rejected the broader contention of the Comptroller that all non-producing property should be excluded. The Comptroller, we were advised, has acquiesced in that decision, and so that aspect of the case is not now before us. On the main issue—the capitalization of royalty payments—the Tax Court sided with the Comptroller. It did so, however, not because it necessarily agreed with the Comptroller's rationale, but rather because it believed that the Comptroller had a statutory right to value the property as he did. The Tax Court relied for that view on the provision in § 316(c) that "[t]he Comptroller of the Treasury shall have the right, in those cases where circumstances warrant, to alter any of the above rules as to ... the manner of valuation of rented property included in the property factor...." It noted that "[t]here is no Maryland statute or Regulation that specifically provides for the capitalization of royalties paid pursuant to a gas or oil lease" and concluded that "absent statutory authority or legal precedent stating that rents and royalties require similar treatment by the Comptroller when valuing leased property, this is a matter squarely within the Comptroller's discretion as authorized by Section 316(c)."

On appeal, as we have noted, the Circuit Court for Baltimore City reversed, concluding "as a matter of law" that the Tax Court erred "in determining the proper basis for determining the value of leased property of the Shell Oil Company." The Circuit Court analogized the transaction to a "percentage lease agreement" and thus held the royalties to be within the purview of COMAR 03.04.01.03E(4).

The Comptroller is now the aggrieved party. He argues that the Circuit Court erred (1) by exceeding the proper bounds of judicial review of a Tax Court decision, and (2) on the merits by misconstruing the nature of a royalty. We find no error in the Circuit Court's judgment and shall therefore affirm.

### (1) *Scope of Review*

Md.Code Ann. art. 81, § 229(*o* ) provides that a Tax Court order shall be affirmed by a reviewing court "if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record."

■ Under this standard, the court must first consider the legal rule, test, or standard applied by the Tax Court to ensure that the Tax Court order was not "premised solely upon an erroneous conclusion of law." *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 834, 490 A.2d 1296 (1985). *See also Supervisor of Assessments v. Carroll*, 298 Md. 311, 469 A.2d 858 (1984). In this analysis, the reviewing court uses the "substitution of judgment" standard, *Supervisor v. St. Leonard Shores Joint Ven.*, 61 Md.App. 204, 212, 486 A.2d 206 (1985), and thus, "is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." *Ramsay, Scarlett & Co., supra*, 302 Md. at 834, 490 A.2d 1296.

If satisfied that there has been no error of law, the court then looks to the Tax Court's findings of fact. As to that, the scope of review is very narrow. As stated in *Ramsay, Scarlett & Co., supra*, 302 Md. at 834–35, 490 A.2d 1296, paraphrasing language in *Comptroller v. Haskin*, 298 Md. 681, 693–94, 472 A.2d 70 (1984):

> "[A] reviewing court may not substitute its judgment for the expertise of the agency; ... [it] must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid; and ... it is the agency's province to resolve conflicting evidence and where inconsistent inferences can be drawn from the same evidence it is for the agency to draw the inferences."

When the case reached the Circuit Court, there was no real dispute between the parties as to the underlying facts. Indeed, as we have noted, the Tax Court made no findings of fact, but simply deferred to what it believed was the Comptroller's statutory discretion. The only issues in dis-

pute were legal ones: were these transactions revealed in the evidence in the nature of leases of land or the sale of minerals; did the royalty payments fall within the meaning of "gross rent," as used in the Comptroller's regulation? These, we think, are purely questions of law—the interpretation of a contract, the pertinent terms of which are unambiguous; the nature of the legal estate conveyed thereby; and the interpretation of a regulation. Whether the Circuit Court was right or wrong in its view, it did not seek to substitute its judgment with respect to any facts or factual inferences for that of the Tax Court. If, as it said, it believed that the Tax Court applied the wrong legal standards to what essentially were undisputed facts, it did not violate any principle of judicial review in reversing the agency decision.

### (2) *Who Is Right?*

The documents creating the relationship between Shell and the landowners are each denoted "Oil And Gas Lease." They use the terms "lessor" and "lessee." Two of the sample leases provide, in paragraph 1, that

"lessor, for and in consideration of the sum of Ten Dollars ($10.00), in hand paid, and of the covenants and agreements hereinafter contained to be performed by the lessee, has this day granted and leased and hereby grants, leases and lets exclusively unto the lessee for the purpose of exploring and operating for and producing oil and gas, laying pipe lines, building tanks, storing oil, building powers, stations [*sic*], telephone lines and other structures thereon to produce, save, take care of and manufacture all of such substances, and for housing and boarding employees, the following described tract of land...." [5]

---

5. The third sample lease used slightly different language in ¶ 1, but conveyed the same thought—that "LESSOR ... has this day granted, demised, leased, and let" the property "unto LESSEE...."

The leases provide for a fixed primary term of years, subject to extension as long as gas or oil is being extracted. The royalty provision, as to oil, with but minor variation, reads as follows:

"The lessee shall deliver to the credit of the lessor as royalty, free of cost, in the pipe line to which lessee may connect its wells the equal one-eighth part of all oil produced and saved from the leased premises, or at the lessee's option, may pay to the lessor for such one-eighth royalty the market price for oil of like grade and gravity prevailing on the day such oil is run into the pipe line, or into storage tanks."

Finally, for our purposes, ¶ 13 of two of the representative leases (and, with minor variations, ¶ 10 of the third), provides, in relevant part, that

"Lessee, at any time, and from time to time, may surrender this lease as to all or any part or parts of leased premises, or as to any mineral or horizon under all or any part of leased premises, by recording a proper instrument of surrender. Upon each surrender as to any part or parts of leased premises, the rental specified above shall be proportionately reduced on an acreage basis...."

There is nothing in these documents, or in the other evidence before the Tax Court, even suggesting that the transaction is anything other than what it clearly purports to be—the conveyance of a leasehold interest in land. Although the lease is for the purpose of exploration for and extraction of oil and gas, it gives to Shell the broader, and exclusive, right to use and possess the surface of the land during the lease term—to build thereon a variety of accessory structures, including housing for employees. The land subject to these leases falls squarely within the definition of "leased or rented property," as that term is used in COMAR 03.04.01.03E(4)(a)—property held by the taxpayer where the legal relation between the parties is that of "Landlord and Tenant." The notion that the transaction amounted to

merely the sale of the minerals finds no support in the record.[6]

■ Upon the record made in the Tax Court, we think it clear, as a matter of law, that the property to be valued is not the gas or oil extracted during the taxable year, but Shell's leasehold interest in the land itself. It is also clear that the royalty payments called for in the leases are in the nature of a percentage rent for that land and are thus within the meaning of "gross rent," as used in COMAR 03.04.01.03E(4), and that, in determining the value of Shell's leasehold interest, those royalty payments are to be capitalized by a factor of eight. To value the leasehold interest at the precise amount of the royalties paid, as the Comptroller suggests in his alternative argument, would create a substantial undervaluation of that property. The royalties amount to only ⅛ to ⅙ of the value of the minerals extracted; under any rational test, the value of the leasehold estate must surely approximate more the total worth of the minerals extracted than that small fraction of it.

Although, as the Tax Court observed, there appears to be no controlling precedential authority on this issue, there have been cases in which the nature of these kinds of leases has been considered, and some of the pronouncements in those cases are of interest.

In *Kiser v. Eberly,* 200 Md. 242, 88 A.2d 242 (1952), the Court was called upon to determine whether a certain tract of land was included under an oil and gas lease. In its consideration of that issue, it had to examine the nature of such a lease—in particular, whether it served to convey an interest in land or acted only as a sale of the minerals. The Court opted for the former, stating, at 245, 88 A.2d 242:

---

**6.** Another problem with the Comptroller's position is that it effectively knocks away the underpinning of the Tax Court's reliance on § 316(c). The Tax Court, as noted, sustained the Comptroller on the basis of his statutory discretion to alter the rules dealing with the valuation of property. But that discretion is plainly limited to "the manner of valuation of *rented* property" (emphasis added). If, as the Comptroller urges, the property to be valued is not "rented" but bought outright, that part of § 316(c) would be inapplicable.

"In some States it has been held that a contract giving the right to explore land for oil and gas and to extract such minerals for a prescribed period of time, and as long thereafter as they are found in paying quantities, on no consideration other than prospective royalties, conveys no corporeal estate in the land, but merely gives a license to mine for the oil and gas and to extract them upon payment of the royalties. Under that holding, so much of the oil or gas as is removed from the land belongs to the parties entitled thereto under the terms of the contract, not as part of the realty but as personalty, and only so much as is removed passes under the grant.... It appears, however, that such a holding is not applicable to an instrument, such as the one before us, which expressly purports to lease the land for the purposes specified, thereby conveying title." (Citations omitted.)

Having rejected the notion that the lease acted as a conveyance of the minerals as personalty, the Court briefly considered a view expressed in some States that treated minerals in place as realty and thereby regarded a lease of the type now before us as conveying a qualified or determinable fee in the property. The Court found it unnecessary to opine on that, however, noting that "notwithstanding considerable real or apparent conflict in the decisions as to the nature of [the substantive] rights [that pass under such leases] all of the cases, with the possible exception of [one], hold that an oil and gas lease conveys an interest in or concerning land." *Kiser, supra,* 200 Md. at 246, 88 A.2d 242. *Compare Ammendale Normal v. Schrom,* 264 Md. 617, 626–27, 288 A.2d 140 (1972), where an agreement permitting a party to "mine sand and/or gravel" for a specified amount per ton was held to be neither "a sale of goods ... nor a lease, but a license to extract certain materials from the ground, a profit *à prendre.*"

The nature of an oil and gas lease was discussed by the Supreme Court in *Burnet v. Harmel,* 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932), the issue there being whether lease bonus and royalty payments constituted ordinary income to

the recipient or gain from the sale of a capital asset. The Court held, at 107, 53 S.Ct. at 75:

"[T]hese leases would not generally be described as a 'sale' of the mineral content of the soil, using the term either in its technical sense or as is commonly understood. Nor would the payments made by lessee to lessor generally be denominated the purchase price of the oil and gas. By virtue of the lease, the lessee acquires the privilege of exploiting the land for the production of oil and gas for a prescribed period; he may explore, drill, and produce oil and gas, if found. Such operations with respect to a mine have been said to resemble a manufacturing business carried on by the use of the soil, to which the passing of title of the minerals is but an incident, rather than a sale of the land or of any interest in it or in its mineral content."

In line with the view that these leases convey an interest in the land rather than title to the minerals, a number of courts, including the Supreme Court, have regarded royalty payments as being in the nature of, or equivalent to, rent. *See, for example, Von Baumbach v. Sargent Land Co.,* 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460 (1917) (involving royalty payments from iron ore mining leases); *Bankers' Pocahontas Coal Co. v. Burnet,* 287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325 (1932) (involving royalty payments for coal mining leases); *Elsinore Oil Co. v. Signal Oil & Gas Co.,* 3 Cal.App.2d 570, 40 P.2d 523 (1935). *See also Atlantic Oil Co. v. County of Los Angeles,* 69 Cal.2d 585, 72 Cal.Rptr. 886, 895, 446 P.2d 1006, 1015 (1968), where the Court observed:

"The analogy between rents and royalties is well settled. Rent paid for a leasehold interest ... is part of the cost or purchase price of the leasehold,.... Rent is a compensation paid for the use of land. It need not be money. Any chattels or products of the soil serve the purpose equally as well.... Similarly, royalty payments are consideration to the lessor for the uses of land allowed by contract. Under the usual oil and gas lease the owner

confers on the lessee for the term of the lease an exclusive right of profit to drill for and produce oil, the lessee usually returning to the lessor for the privilege granted a rent or royalty measured by a fraction of the oil produced.... Thus in *Callahan v. Martin,* supra, 3 Cal.2d 110, 123, 43 P.2d 788, 795, 101 A.L.R. 871, the case in which we rejected the theory of ownership of oil and gas in place, we recognized that royalty return ... is rent, or so closely analogous to rent as to partake of the incidents thereof. The words 'royalty' and 'rent' ... are used interchangeably to convey the same meaning; i.e., the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows...." (Citations and some punctuation omitted.)

We see nothing in the record before us that would support a conclusion different than those expressed in these cases. We therefore agree with the Circuit Court that the Tax Court erred as a matter of law in failing to regard the royalty payments as being in the nature of "gross rent," and thus in failing to value Shell's leasehold interests by capitalizing those payments as required by the regulation.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.