558 A.2d 428

# STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

v.

# LOYOLA FEDERAL SAVINGS & LOAN ASSOCIATION.

No. 1005, Sept. Term, 1988.

Court of Special Appeals of Maryland.

June 5, 1989.

Kaye Brooks Bushel, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Mark J. Friedman (Piper & Marbury, on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

This case presents the question of whether a taxpayer can get a double benefit from a net operating loss because of an ambiguous Maryland franchise tax form. In June of 1988, the Circuit Court for Baltimore City determined that Loyola Federal Savings & Loan Association (Loyola) was entitled to such a deduction. We conclude that no such double benefit is available.

At issue in this appeal is the starting point in the calculation of the Maryland Franchise Tax. This issue arises because of a poorly drafted state franchise tax form. Line 1 of the state franchise tax form requires the taxpayer to insert the "Taxable Income Per Federal Return Attached." Simple as this directive seems, the State has interpreted it to require one number and Loyola a different number. The State Department of Assessments and Taxation (SDAT) contends the number must be a positive number or zero. Loyola, on the other hand, submits that line 1 can be a negative number. In other words, if a taxpayer incurs a loss which is reflected on its federal income tax return, there arises a question about what number must be inserted on line 1 of the State return. A literal interpretation of the instructions on the franchise tax form regarding what number is to be inserted permits a negative number. This is what Loyola did. By entering a negative number, however, the taxpayer is able to parlay this entry into a double benefit on that loss. SDAT argues that this is not permitted under current tax structure unless the taxpayer gives up the right to exercise an alternate method which we will discuss later. We agree and explain.

For the years in question, the franchise tax was a tax on the net earnings of savings and loan associations without

allowance for dividends or interest paid to depositors.[1] The tax was then computed at the rate of three-fourths of one percent of that portion of annual net earnings over $100,-000. Md.Code Ann. Art. 81, § 128(c) (1957, 1980 Repl.Vol.).[2] The tax was determined by completing and filing a Maryland franchise tax form. The franchise tax form began with entering the federal taxable income. Accordingly, for purposes of calculating the state franchise tax, the calculation of the net earnings of a savings and loan association started with the determination of federal taxable income. On Loyola's 1982 federal tax return, it recorded a loss of $78,527,021 and entered that amount on line 30 of its federal return. This occurred because Loyola had far more deductions permitted by the Internal Revenue Code than it had gross income to absorb those deductions. When this results, it is called a net operating loss and, within certain limits, is authorized as a deduction by I.R.C. § 172(a) (1988).

---

**1.** Maryland Tax–Gen.Code Ann. § 10–104(4) (1988) exempts financial institutions from Maryland income tax but imposes a franchise tax in lieu of that tax based on federal taxable net income, as modified by State law.

**2.** The franchise tax on savings and loan associations is now governed by Title 8, Subtitle 2 of the Tax–General Article (1988). The general revisor's note to Subtitle 2 explains that Subtitle 2

"combines the provisions of former Art. 81, § 128, which imposed a franchise tax on 'savings banks and building, savings and loan associations', and § 128A, which imposed a franchise tax on 'financial institutions'.

"Before 1983, the 2 taxes differed basically in their rates and methods to determine the 'net earnings' on which the taxes were calculated. Chapter 358, Acts of 1983, provided that between January 1, 1984 and January 1, 1986, the tax rate and the 'net earnings' determination for the taxation of 'savings banks and building, savings and loan associations' under former Art. 81, § 128, change to the same rate and 'net income' determination that applied to entities taxed under former Art. 81, § 128A as 'financial institutions'."

Under Md.Tax–Gen.Code Ann. § 8–203 (1988), the franchise tax rate is currently seven percent of taxable net earnings, but allowing deductions for payment of dividends and interest. Citations will be to the former statutory provisions, unless otherwise necessary.

The net operating loss deduction provision was enacted in recognition of the problem experienced by taxpayers who had wide fluctuations in income and losses in different tax periods. Under the present tax scheme, the more money one makes, the more one is taxed. Consequently, a taxpayer who makes a large amount of money in one year will probably pay more tax on that amount than would a taxpayer who made that same amount over two years. This same distortion happens with deductions, and is exacerbated if one year results in a loss.

Congress enacted § 172 to alleviate these consequences, at least where the taxpayer suffers a net loss in a particular year, by allowing the taxpayer who incurs loss to spread out that loss to years in which the taxpayer had or will have profits. The procedure used to spread out these losses essentially involves three steps. First, the taxpayer computes the net operating loss for the taxable year. Once the net loss is determined for a particular year, the taxpayer is permitted to use that loss as a deduction to reduce taxable income in a specified manner[3] in years other than the year in which the loss arose.[4] If the tax was paid for the earlier year, the tax must be recomputed and ordinarily a tax refund will result. Conversely, if the loss is carried forward to another profitable year, it merely reduces taxable income resulting in less tax paid.

---

**3.** A net operating loss is ordinarily carried back three years preceding the year of the loss and forward 15 years following the year of the loss. § 172(b)(1). Financial institutions are subject to a different rule. Section 172(b)(1)(F) provides:

"In the case of a financial institution ... a net operating loss for any taxable year beginning after December 31, 1975, and before January 1, 1987, shall be a net operating loss carryback to each of the 10 taxable years preceding the taxable year of such loss and shall be a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss."

**4.** Section 172(b)(2) provides in part that the *"entire amount of the net operating loss* for any taxable year ... shall be carried to the earliest of the taxable years to which ... such loss may be carried." (Emphasis added.)

Since Maryland income tax law is to be construed in a fashion conformable to the Internal Revenue Code, to which it is inextricably keyed, *Comptroller of the Treasury, Income Tax Division v. Diebold, Inc.,* 279 Md. 401, 408, 369 A.2d 77 (1977), whatever tax treatment is accorded to net operating losses on the federal return is given similar treatment for state purposes to calculate the state franchise tax. Keeping in mind how the net operating loss is handled under federal income tax law, we return to what happened in the instant case.

Loyola filed its federal income tax return which showed an actual federal tax loss of $78,527,021 on line 30 of the tax return. This occurred, in large part, because Loyola was permitted to deduct interest paid to its depositors on savings accounts and certificates of deposit as a deduction against income. Under § 128(c), income for Maryland franchise tax purposes, particularly at the point in time relevant here, differed greatly from what was considered to be taxable income under federal law. For state franchise tax purposes, the interest Loyola paid to its depositors, which was allowed as a deduction on the federal tax return, was required to be added back to the federal taxable income for purposes of the state franchise tax. Accordingly, Loyola added back as income $103,927,522 paid as interest to depositors. Although Loyola had an actual federal income tax loss of $78,527,021 for 1982, its state franchise tax return did not show a loss, but instead reflected a positive taxable adjusted net income. As a consequence, Loyola had to pay a franchise tax of over $100,000. If Loyola had started its state franchise tax form with zero, instead of the $78,527,021 loss, its state taxable income for 1982 would have been $78,527,021 higher, thus resulting in a larger franchise tax. Therein lies the benefit. By starting the form with the $78,527,021 loss, the franchise tax Loyola was subject to was much lower than if it had started the form with zero. For tax years 1975–80, 1983 and 1984, Loyola carried back and carried forward the $78,527,021 loss incurred in 1982 to reduce taxable income in those

years, again resulting in a lower franchise tax as explained above. Loyola thus received a double benefit by being able to use the 1982 net operating loss twice.[5]

Loyola recouped this benefit by filing amended tax returns for the above tax years and subsequently Loyola received refunds from the Comptroller of the Treasury.[6] In 1984, however, Loyola claimed a refund which was denied by SDAT based upon its determination that Loyola had already utilized the entire $78,527,021 federal net operating loss to reduce income on its 1982 Maryland return. This prompted an audit by SDAT of Loyola's tax returns for 1975-80, 1982 and 1983. Based upon this audit, SDAT issued franchise tax assessments against Loyola, which then appealed these assessments to the Maryland Tax Court.

At the tax court hearing, Spencer Merrick, Supervisor of the Public Utilities and Financial Section of SDAT, explained his audit findings with reference to Loyola's franchise tax returns. Merrick stated that in 1982 Loyola had a federal net operating loss of $78,527,021. As required, Loyola added back the interest paid to its depositors, utilizing the entire $78,527,021 loss. Merrick further testified that it was an administrative practice at SDAT that, if the loss was entirely consumed on the franchise tax form in the year in which it occurred, as was the situation in the instant case, the loss was not available to carry back or carry forward. Merrick also indicated, however, that Loyola could, at its option, start the 1982 franchise tax form with zero (before adding back the interest paid) and have the full

5. Although Loyola did not get the full benefit of using the $78,527,021 twice, it did realize an additional benefit of $56,317,696 it would not have been entitled to use.

6. The franchise tax was administered by the Comptroller of the Treasury prior to 1984. Effective January 1, 1984, the responsibility for administering the franchise tax on savings and loan associations was transferred to SDAT. Loyola received refunds from the Comptroller for tax years 1975-80 and was denied a refund in 1984 by SDAT.

amount of the $78,527,021 loss available for carryback or carryforward, as it saw fit. In other words, Loyola could decline to take the loss in the year it was incurred and utilize that loss in carryback and carryover years. Merrick concluded that, by using the $78,527,021 loss in 1982, carryback years and subsequently in carryover years, Loyola had received a benefit of deductions of $56,317,696 more than it was entitled. As a result, SDAT issued assessments for these tax years.[7]

Loyola appealed the denial of the refund for 1984 and the assessments for tax years 1975–80, 1982 and 1983 to the Maryland Tax Court. The tax court reversed both the assessments and the denial of the refund. The tax court held that Loyola properly complied with State law in reporting federal taxable income as a negative amount in 1982 and later carried back and carried forward the same net operating loss to offset Maryland income in other years.

The circuit court affirmed, reasoning that Loyola was merely reporting its income as derived from its federal return, as was indicated on the state form; Loyola had not, certainly, reported any net loss that was *greater* than what it claimed on its federal return. The circuit court found that the fact that Loyola received an additional benefit violated no Maryland or federal tax law, since there was no law which disallowed it. The circuit court found that SDAT was attempting to correct a situation, *i.e.*, the ambiguous tax form which allowed this result, with a policy that had no basis in law. In short, since Loyola had complied with the literal requirements of the state franchise tax form, it could

---

7. For 1982, SDAT did not permit Loyola to use a negative amount as the starting point on line 1 of the franchise tax form, thus causing the assessment for that year. For 1975–80 and 1983, SDAT issued assessments against Loyola based upon its use of the entire $78,527,021 net operating loss in 1982. In effect, the assessments for the tax years 1975–80, 1982, and 1983 precluded Loyola from using the net operating loss in any year. In conceding that the assessments were inconsistent, Merrick explained that SDAT just wanted to keep all the tax years before the court.

take full advantage of the serendipitous result. We disagree.

## STANDARD OF REVIEW

 A decision of the tax court is subject to review under Md. Tax–Gen.Code Ann. § 13–532 (1988). Our scope of review is found in Md. State Gov't Code Ann. § 10–215(g) (1984), which provides that we may modify a tax court order if it is erroneous as a matter of law or if it is unsupported by substantial evidence appearing in the record. Where the tax court's decision is based upon a factual determination, a reviewing court must use the substantial evidence test. *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.*, 313 Md. 614, 627, 547 A.2d 190 (1988). This test requires a determination of "whether a reasoning mind could have reached the factual conclusion reached by the [tax court]." *Asbury*, 313 Md. at 625, 547 A.2d 190 (citations omitted). In making this determination, we cannot substitute our judgment for that of the tax court. *Asbury*, 313 Md. at 626, 547 A.2d 190. A reviewing court may, however, substitute its judgment for that of the tax court in considering the legal standard. Under this standard, we are under no statutory constraint to uphold a tax court order "which is premised solely upon an erroneous conclusion of law." *Comptroller of the Treasury v. Shell Oil Co.*, 65 Md.App. 252, 259, 500 A.2d 315 (1985). We hold that the question in the instant case is one of law, since it involves neither tax court expertise nor basic fact finding. Here, the only issues in dispute are legal ones: must the starting point on the Maryland franchise tax form be a positive number? Does SDAT have authority to assess tax for years prior to 1983? Does the treatment of the net operating loss conform to federal tax law? These are questions that involve the interpretation of Maryland income tax law as it relates to the Internal Revenue Code.

We recognize the expertise of the tax court and ordinarily it is free to exercise its discretion. *Mayor of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 395, 396 A.2d 1080

(1979). We hold that the tax court's expertise was not at issue here as the decision was premised upon an erroneous conclusion of law.

## DOUBLE BENEFIT

■ In essence, SDAT contends that federal taxable income, for purposes of computing the state franchise tax, cannot be a negative number. SDAT argues that, if the taxpayer commences line 1 with a negative number, it results in a double benefit to the taxpayer. This is because the franchise tax Loyola ultimately paid was much less than it would have been if it had started the franchise tax form with zero.

SDAT submits that to allow Loyola to use the net operating loss as it has would be contrary to the principle of conformity to federal taxable income because Loyola received a deduction far in excess of the net operating loss permitted by federal law. On the other hand, Loyola argues that I.R.C. § 63(a) (1988) defines taxable income as "gross income minus the deductions" allowed by the Internal Revenue Code. This definition, Loyola contends, does not require a positive number. Thus, if a net operating loss occurs in a tax year, which is reflected on line 30 of the federal return, that loss is the starting point on line 1 of the franchise tax form. Accordingly, Loyola submits that its return conformed to the Internal Revenue Code since it used federal net taxable income as the starting point.[8]

---

8. Loyola and SDAT rely on *Ford Motor Land Development Corp. v. Comptroller,* 68 Md. App. 342, 511 A.2d 578 (1986), and *Sun Oil Co. of Pennsylvania v. Comptroller of the Treasury,* (Md. Tax Court) No. 1050 (1982) CCH State Tax Reporter §§ 200–960, 1982 WL 1767, to support their positions. We find both of these decisions inapposite. *Ford Motor* discussed the concept of positive taxable income under a statute different from that in the instant case. The statute in *Ford Motor* dealt with allocation between in-state and out-of-state receipts. In *Sun Oil,* the taxpayer sought the benefit of an unused prior net operating loss to reduce the net taxable income. This is in opposition to the instant case where the taxpayer sought the benefit of a used prior net operating loss to reduce the net taxable income.

The common thread running through both parties' arguments is Maryland's conformity to the federal income tax law. The parties disagree, however, as to what conformity requires. In framing the issue this way, the parties avoided the reality of the situation. We find the central issue to be: can Loyola get a multiple use out of a single loss?

In order to resolve this issue, we return to the basic principle relied upon by both parties as well as the tax court and the circuit court. That basic principle is that "Maryland income tax law is to be construed in a fashion conformable to the Internal Revenue Code to which it is inextricably keyed." *Diebold,* 279 Md. at 408, 369 A.2d 77. Maryland Code Ann. Art. 81, § 304(a) (1957, 1980 Repl.Vol., 1987 Cum.Supp.) (now Md.Tax–Gen.Code Ann. § 10–107 (1988)), directs the Comptroller to "apply as far as practicable the administrative and judicial interpretations of the federal income tax law." *See also Comptroller of the Treasury v. Chesapeake Corp. of Virginia,* 54 Md.App. 208, 213–14, 458 A.2d 459 *cert. denied,* 296 Md. 653 (1983). Accordingly, any consideration of the application of net operating loss and the deductions arising therefrom must conform to federal law.

Loyola avers that the manner in which it reported its loss in 1982 and the subsequent use of that same loss to carry back and forward to offset income in other years conformed to federal law. Loyola reported, on line 1 of the state franchise tax form for 1982, as required, its federal income which was the actual amount of loss incurred in that year. Consistent with § 172, it reported its net federal taxable income as zero in 1975–80, 1983 and 1984, the carryover years. Thus, Loyola argues, it conformed to federal law and Maryland law. Moreover, Loyola avers that because the form was prescribed by the Comptroller pursuant to a grant of legislative authority, the form's requirements should be deemed to be dispositive.

Appealing as this argument may be, the consequences are inconsistent with common sense. Common sense tells us that, if allowed, this double use of the 1982 net operating

loss would be the practical equivalent of a double deduction. Such use would be contrary to established case law. Interestingly, in both the briefs and at oral argument, Loyola denies it received a double benefit. We fail to see how an aggregate $134,844,717 in deductions taken by Loyola based on a $78,527,021 loss is anything but at least in part a double benefit. The Supreme Court has stated that the Internal Revenue Code is not to be construed to permit " 'the practical equivalent of double deduction' " absent a clear declaration of intent by Congress. *United States v. Skelly Oil Co.*, 394 U.S. 678, 684, 89 S.Ct. 1379, 1383, 22 L.Ed.2d 642 *reh'g denied*, 395 U.S. 941, 89 S.Ct. 1992, 23 L.Ed.2d 458 (1969), quoting *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68, 54 S.Ct. 596, 598, 78 L.Ed. 1127 (1934). *See also, Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23, 24–25 n. 2, 107 S.Ct. 980, 988–89 n. 2, 94 L.Ed.2d 25 (1987) (White, J., dissenting); *Marwais Steel Co. v. Commissioner of Internal Revenue*, 354 F.2d 997, 998–99 (9th Cir.1965); *Missouri Pacific Railroad Co. v. United States*, 167 Ct.Cl. 725, 337 F.2d 637, 640 (1964); *Ford v. United States*, 160 Ct.Cl. 417, 311 F.2d 951, 955 (1963); *Candy Bros. Mfg. Co. v. Commissioner of Internal Revenue*, 198 F.2d 330, 333 (8th Cir.1952); *Comar Oil Co. v. Helvering*, 107 F.2d 709, 711 (8th Cir.1939); *Commissioner of Internal Revenue v. National Casket Co.*, 78 F.2d 940, 941 (3d Cir.1935); *Baltimore & O.R. Co. v. Commissioner of Internal Revenue*, 78 F.2d 456, 459 (4th Cir.1935).

Loyola contends that it complied with the law and, in the absence of a statutory provision to the contrary, it is up to the Legislature specifically to address the problem resulting from the form. We find the reasoning of the Supreme Court in *Charles Ilfeld Co.* persuasive. In *Charles Ilfeld Co.*, 292 U.S. at 68, 54 S.Ct. at 598, Justice Butler opined:

> "In the absence of a provision of the Act definitely requiring it, a purpose so opposed to precedent and equality of treatment of taxpayers will not be attributed to lawmakers. There is nothing in the Act that purports to

authorize double deduction of losses...." (Citations omitted.)

Likewise, we find nothing in the Maryland tax law which purports to authorize the practical equivalent of double deductions. Since Maryland tax law is extricably keyed to the Internal Revenue Code, we find that Loyola's double use of a single loss is the practical equivalent of a double deduction and thus impermissible. Otherwise, Loyola would receive a tax windfall, the equivalent of unjust enrichment. By disallowing the refunds to Loyola, no injustice would result to either party and there would be "equality of treatment of taxpayers."

■ Insofar as the ambiguity in the tax form, we find it is not controlling. While generally ambiguities are to be resolved in favor of the taxpayer, deductions, on the other hand, are allowed only when plainly authorized. *Helvering v. Inter–Mountain Life Ins. Co.*, 294 U.S. 686, 689, 55 S.Ct. 572, 574, 79 L.Ed. 1227 (1935). In the instant case, the use of the 1982 federal net operating loss as a starting point on the state form enabled Loyola to deduct $78,527,021 from net income in that year, considerably reducing its franchise tax. Loyola then carried back *and* carried forward that same net operating loss to reduce net income in other years. Although the tax court and circuit court characterized this as an additional use, the financial reality is that Loyola received $56,317,696 *more* in deductions than it otherwise would. Nowhere do we find any authority for such use of the net operating loss deduction, nor does Loyola cite authority which supports its claim to this tax benefit. Instead, our research has revealed that the federal law does not permit a taxpayer to deduct a loss in one year and deduct the same loss yet again in another year. That is exactly what Loyola sought to do here.

■ Moreover, Art. 81, § 304(a) provided that the Comptroller had the power "to promulgate such rules and regulations and to prescribe such forms as may be necessary for

the enforcement of this subtitle...."[9] Regulations and rules, however, are only effective insofar as they are reasonable and consistent with the statutory scheme. *Farber's, Inc. v. Comptroller of the Treasury of the State of Maryland,* 266 Md. 44, 50–51, 291 A.2d 658 (1972). We find this principle analogous to the issuance of forms prescribed by the Comptroller. Holding that the tax form is controlling would be inconsistent with the treatment of a net operating loss under the Internal Revenue Code.

 ██ In further support of our conclusion, we point out that, in interpreting tax law, substance prevails over form. *Commissioner of Internal Revenue v. Hansen,* 360 U.S. 446, 461, 79 S.Ct. 1270, 1278, 3 L.Ed.2d 1360 (1959); *Commissioner of Internal Revenue v. P.G. Lake, Inc.,* 356 U.S. 260, 266–67, 78 S.Ct. 691, 695, 2 L.Ed.2d 743 (1958). Here, the draftsmanship of the state form was inartful, inviting Loyola to insert the negative figure from the federal form. But the state form does not control. Rather, we must look to the total effect of the transaction—a franchise tax savings to Loyola disproportionate to the actual loss sustained. Despite the ambiguity of the state form, we cannot permit a result totally inconsistent with the fundamental principle of income tax law not to allow a double deduction of the same expense.

Our research into other jurisdictions shows that virtually this precise question has been addressed by the Supreme Court of Missouri. Under factual circumstances analogous

---

**9.** Now codified in Md.Tax–Gen.Code Ann. §§ 2–103 and 2–104 (1988). Section 2–103 empowers the Comptroller to adopt reasonable regulations to administer the tax laws. Section 2–104 provides in pertinent part:

"(a) [T]he Comptroller shall design the returns and other forms that, on completion, provide the information required for the administration of the tax laws....

"(b) **Similarity of State and federal income tax forms.**—Except for variations that the differences between the federal and State income tax laws require, the forms that the Comptroller designs to administer the income tax laws shall be similar to the forms used to administer the federal income tax laws."

to the instant case, the taxpayer in *Brown Group, Inc. v. Administrative Hearing Commission,* 649 S.W.2d 874 (Mo. 1983), entered on line 1 of the Missouri tax return a loss in excess of $5 million which represented its federal taxable income. The Commissioner argued that the allowance of a negative number on line 1 would result in multiple benefits to the taxpayer since the loss would be available as a carryback to offset income in prior years. The Court agreed and found that the amount entered on line 1 of the State corporate income tax return could not be less than zero. The Court reasoned that the taxpayer's interpretation of "federal taxable income" was unduly narrow and ignored other Internal Revenue Code provisions. The Internal Revenue Code "must be construed as an entirety with the purpose of giving as full meaning to all expressions therein as harmony will allow." *Brown Group Inc.,* 649 S.W.2d at 877, quoting *Dubinsky v. Becker,* 64 F.2d 601, 602 (8th Cir.1933). The Court went on to hold:

> "When a taxpayer incurs a federal loss its sole recourse is to § 172. That is the only reasonable consequence of constructing § 63 in harmony with § 172. Any other holding would subject a single loss to multiple use in Missouri without the requisite statutory authority."

*Brown Group, Inc.,* 649 S.W.2d at 877.

We find *Brown Group, Inc.* persuasive,[10] not only in its resolution of the multiple benefit issue, but also as requiring zero as a starting point on a state form in the year of loss. Our holding, as well as that in *Brown Group, Inc.,* conforms to § 172. To hold otherwise would be wholly at odds with the legislative purpose.

Ordinarily, our next task would be to rectify this multiple benefit to Loyola. Our review of the record, however,

---

**10.** The holding in *Brown Group, Inc.* went on further to hold that the loss could not be taken in the year in question as it served to reduce express modifications. SDAT has not urged this as it has tacitly permitted such treatment, *supra.*

disclosed that SDAT never denied that the taxpayer had the option to handle the net operating loss either by (1) taking the net operating loss in the year incurred, or (2) using zero as a starting point on the state franchise tax return in the year the loss was incurred and carry that loss backward and forward. In fact, Merrick acknowledged that SDAT's policy was to allow the taxpayer that option. SDAT has never challenged Loyola's right to exercise that option. We will not ordinarily decide an issue neither raised nor decided in the trial court. Rule 8–131(a). This is particularly true where as here the contention is not even raised on appeal. Accordingly, we remand to the circuit court to permit Loyola to exercise that option.

## SDAT'S AUDIT AUTHORITY

■ In light of our holding, we must address Loyola's contention that SDAT has no authority to assess tax for years prior to 1983. Loyola argues that, since SDAT's power to administer the franchise tax was not effective until January 1, 1984, SDAT is without power to assert new interpretations retroactively to periods administered by the Comptroller. We disagree.

Section 128(d) was amended to transfer the responsibility for administering the franchise tax on savings and loan institutions from the Comptroller to SDAT beginning January 1, 1984. In accordance with that transfer, SDAT was given the "same administrative and rule making powers and duties with respect to the franchise tax" as the Comptroller. § 128(g).[11] As part of those administrative powers and duties, SDAT was given the authority to audit returns as it deemed necessary. Md.Code Ann. Art. 81, § 309(a) (1957, 1980 Repl.Vol.). As part of that authority, SDAT was empowered to assess a tax "within 3 years after the return was filed or within 3 years after the due date for such

---

11. *See* n. 1 *supra.*

return, whichever date is later." § 309(b).[12]

In the instant case, SDAT became aware of the subject franchise tax liability because of the audit of Loyola's 1984 return. SDAT informed Loyola of the results of the audit on November 1, 1985. Subsequently, in May, 1986, it notified Loyola that it had assessed additional taxes as a result of the errors on the 1982 return which was filed in July, 1983 and the amended returns for 1975–80 which were filed in December, 1983. Consequently, we find Loyola's contention without merit since the assessments were made within the limitation period prescribed by § 309(b).

JUDGMENT REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.

---

**12.** The Comptroller presently is empowered to audit tax returns and make assessments under Title 13 of the Tax–General Article (1988). *See* § 13–301 regarding audits and § 13–401 regarding assessments. Section 13–1101 governs the time for making an assessment.