658 A.2d 1172

**Arlena BEEMAN**

v.

**DEPARTMENT OF HEALTH & MENTAL HYGIENE.**

**No. 1353, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

June 2, 1995.

148

Ada E. Cherry–Mahoi, Baltimore (Andrew S. Penn, Landover, on the brief), for appellant.

David R. Morgan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before BISHOP, DAVIS and HOLLANDER, JJ.

HOLLANDER, Judge.

In this appeal, we consider the extent to which a patient, involuntarily committed to a State psychiatric facility, can be forced to take neuroleptic [1] and side-effect medications pursuant to Md.Code Ann., Health–Gen. Art. ("HG") § 10–708 (1993). Appellant Arlene Beeman, who was involuntarily committed to the Thomas B. Finan Center (the "Finan Center") for treatment of schizo-affective disorder, refused to take certain drugs prescribed by Dr. E. Michael Ehlers, her psychiatrist. The Finan Center's Clinical Review Panel ("CRP"), convened pursuant to HG § 10–708, authorized Dr. Ehlers to administer a series of drugs, alone or in combination, at a wide range of doses. After holding a de novo hearing, an Administrative Law Judge ("ALJ") at the Office of Administrative Hearings ("OAH") agreed with the CRP's decision. Thereafter, the Circuit Court for Allegany County affirmed the ALJ's decision.

On appeal to this Court, Beeman has raised four issues:

1. Whether the Administrative Law Judge and the circuit court erred in approving forced administration of Cogentin and other side effect medications to involuntary patients even though they are not medications prescribed for treatment of a mental disorder as defined by Section 10–708?

2. Whether the Panel's authorization of the involuntary administration of psychiatric medication up to the maximum allowable therapeutic dosage and in various combi-

---

1. "Neuroleptic" medication refers to an antipsychotic medication. THE NEW WEBSTER'S MEDICAL DICTIONARY 159 (1988).

nations in nonspecific doses violates the statutory requirement that "the decision shall specify: (1) the medication or medications approved and the dosage and frequency range"?

3. Whether the circuit court improperly ruled that the administrative hearing record contained substantial evidence to support the findings in light of the court's admission that the ALJ hearing audiotape was inaudible and that the court had to rely instead on counsel's representations of what had occurred?

4. Whether the failure of the circuit court to hear the case within the statutorily mandated timeframe constitutes reversible error?

Appellee, the Department of Health and Mental Hygiene ("DHMH"), contends that all of these issues are moot. We agree with DHMH that, based on the posture of this case, all issues are moot. Nonetheless, issues 1 and 2 are worthy of consideration despite their mootness; we conclude that the authorization of forced medication, including medication prescribed for "side-effects," did not violate the requirements of HG § 10–708. On the other hand, the CRP lacked authority to approve any medications or dosage ranges that were not requested by the treating psychiatrist. On the ground of mootness, we decline to consider the procedural questions raised in issues 3 and 4.

### *Factual Background*

The evidence in the thin record in this case essentially consists of a transcript of the audiotapes of the hearing before the ALJ. Unfortunately, the tapes were of such poor quality that the testimony is largely unintelligible. Nevertheless, for the purposes of this appeal, the facts are largely undisputed. Accordingly, we have gleaned the summary that follows from the decisions of the ALJ and the circuit court, along with the few usable portions of the transcript, and as amplified by the uncontested portions of the parties' briefs.

Appellant, who is sixty-two years old, has long been diagnosed as having schizo-affective disorder. More than once, she has been committed involuntarily to the Finan Center for this illness. Although she does respond to medication, the symptoms of her condition have been difficult to manage.

The dispute that gives rise to this appeal began after Beeman was committed on July 14, 1993. In early January 1994, Dr. Ehlers prescribed three oral medications: Haldol at 10 milligrams twice per day, Anafranil at 50 milligrams per day, and Depakote at 500 milligrams twice per day. When Beeman refused to take any of these medications, Dr. Ehlers requested authorization to administer the drugs forcibly. Following a hearing on January 6, 1994, at which Beeman and a lay adviser were present, the Finan Center's CRP authorized the following treatment for 90 days:

Haloperidol (Haldol) PO at a total daily dose not to exceed 100 mg. If the PO dose is refused, Haloperidol Lactate at a total daily dose not to exceed ½ of the current PO dose may be given. In the event that the patient refused the PO doses and requires IM injections for two times in a given week, the Panel approves Haloperidol Decanoate at a dosage equivalent not to exceed 250 mg IM q 4 weeks. The dosage is to be titrated by the Attending Physician based on the clinical symptoms. *The Panel also approves the use of Depakote at a total daily dose not to exceed 3000 mg.* The dosage will be titrated by the Attending Physician based on the clinical symptoms. *In the event that the patient experiences any extrapyramidal symptoms, the Panel approves Anti-dyskinetic medications* with the Attending Physician titrating them based on the clinical symptoms. *Benztropine (Cogentin) not to exceed 6 mg/day PO or IM,* Trihexyphenidyl (Artane) not to exceed 8 mg/day PO or IM, Amantadine (Symmetrel) PO not to exceed 200 mg/day, or Diphenhydramine (Benadryl) not to exceed 150 mg/day PO or IM. If [the] patient develops akathisia, Propranolol at a total daily dosage not to exceed 240 mg, may be given if needed. If the patient does not respond to Haldol, the Attending Physician may use other neuroleptics not to exceed the

following daily doses: Chlorpromazine (Thorazine) 200 mg; Mesoridazine (Serentil) 500 mg; Thiothixene (Navane) 80 mg; Perphenazine (Trilafon) 64 mg; Trifluoperazine (Stelazine) 80 mg; Fluphenazine (Prolixin) 80 mg; Loxapine (Loxitane) 250 mg; Molindone (Moban) 250 mg; or Fluphenazine Decanoate (Prolixin) 750 mg q 2 weeks.

(Emphasis added).

Beeman received a copy of the decision on January 11, 1994. Some forty minutes later, she filed a petition for administrative review through her counsel.[2] On January 24, 1994, following a de novo hearing, the ALJ affirmed the CRP's authorization of treatment, appending and annexing the CRP's instructions to his own decision, without modification. No one asked the ALJ to stay its order. Accordingly, two days later, forced treatment began.

On January 27, 1994, Beeman filed a petition for review by the circuit court, but incorrectly captioned her petition. Thereafter, on February 2, 1994, Beeman filed an amended petition for review, this time with the correct caption. In her petitions for review, appellant requested a stay of the ALJ's decision; her request, however, apparently was never addressed by the circuit court. On February 17, 1994, DHMH filed a Motion for Reversal, based on procedural grounds. Evidently, no request was made to transcribe the audiotapes from the OAH hearing, and no one attempted to listen to the five and a half hours of audiotapes prior to the hearing before the circuit court. The circuit court ultimately heard the case on March 18, 1994. According to the docket entries in the record, the OAH audiotapes were transmitted to the circuit court on that day.

After listening to the audiotapes, the court described them as "generally poor quality and in substantial part inaudible due to static and background noise," and "of essentially mini-

---

2. Apparently, Beeman had retained counsel to represent her in prior hearings involving forced medication. One such case, concerning other issues, awaits argument before this Court. *Beeman v. DHMH*, No. 188 (Sept. 1995 Term).

mal help." The court therefore decided to place "supplemental reliance ... upon the notes and recall of counsel, as provided at oral argument." On the merits of Beeman's appeal, the court found "substantial evidence" to support the ALJ's decision, but did not identify that evidence specifically.

The ALJ's order authorizing forced treatment expired after ninety days. According to DHMH, Beeman responded well to the treatment; she was released from the Finan Center on August 18, 1994, and has been receiving treatment on an out-patient basis.

### Discussion

### I. Scope of Review

The scope of review on appeal to this Court is essentially the same as the circuit court's scope of review. We must review the administrative decision itself. *Pub. Svce. Comm'n v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362, 329 A.2d 691 (1974); *State Election Bd. v. Billhimer*, 72 Md.App. 578, 586, 531 A.2d 1298 (1987), *rev'd on other grounds*, 314 Md. 46, 548 A.2d 819 (1988); *see also Dep't Econ. & Emp't Dev't v. Hager*, 96 Md.App. 362, 625 A.2d 342 (1993). Decisions of the OAH are subject to review under the Administrative Procedure Act ("APA"), Md.Code Ann., State Gov. Art. ("SG") § 10–222 (Supp.1994). Subsection (h) provides that the reviewing court may—

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

 i. is unconstitutional;

 ii. exceeds the statutory authority or jurisdiction of the final decision maker;

 iii. results from an unlawful procedure;

 iv. is affected by any other error of law;

 v. is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

 vi. is arbitrary or capricious.

*See also, Md. State Police v. Lindsey,* 318 Md. 325, 332–34, 568 A.2d 29 (1990); *State Election Bd. v. Billhimer,* 314 Md. 46, 548 A.2d 819 (1988); *Warner v. Town of Ocean City,* 81 Md.App. 176, 567 A.2d 160 (1989); *Harford Mem'l Hosp. v. Health Svces. Cost Rev. Comm'n,* 44 Md.App. 489, 410 A.2d 22 (1980).

 ■■■■ Where the question on appeal is the sufficiency of the evidence to support a decision, we must determine "whether a reasoning mind could have reached the factual conclusion reached by the agency." *Supervisor of Assessments of Montgomery Co. v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625, 547 A.2d 190 (1988). In making this determination, we may not substitute our judgment for that of the agency. *Id.* at 626, 547 A.2d 190. When the issues concern interpretation of federal and Maryland statutes, however, we afford the agency no such deference. *State Dep't of Assessments & Taxation v. Loyola Fed. Sav. & Loan Ass'n,* 79 Md.App. 481, 498–90, 558 A.2d 428 (1989); *Comptroller of the Treasury v. Ramsay, Scarlett & Co.,* 58 Md.App. 327, 340–41, 473 A.2d 469 (1984).

## II. Statutory Background

 The resolution of the issues in this case depends, at least in part, on the language of HG § 10–708.[3] Beeman contests only the application of § 10–708, not its constitutionality. *See Williams v. Wilzack,* 319 Md. 485, 573 A.2d 809 (1990) (in light of *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), prior statutory version deprived patient subject to involuntary medication of significant procedural due process rights). Accordingly, before turning to the issues presented, we must review the contours of this section.

---

**3.** Under its enabling provisions, HG § 10–708 was due to expire on July 1, 1994. 1991 Md. Laws ch. 385, § 2. The expiration of HG § 10–708 was extended, by 1995 Md. Laws ch. 266, to January 1, 1999.

Under subsection (b), medication may not be forced upon a nonconsenting patient except in two situations—an emergency, or a non-emergency in which "the individual is hospitalized involuntarily ... and the medication is approved by a panel under the provisions of this section." As no emergency was present here, medication could only be forced upon Beeman if approved by a CRP as provided in HG § 10–708.

Where a panel convenes a hearing to consider forcing treatment, the panel must provide 24–hour notice of the hearing to the patient. HG § 10–708(d). At the hearing, the patient has the right to attend, present information and witnesses, cross-examine witnesses presented by others, consult with a lay advisor, and to be provided with an explanation of "the clinical need for the medication or medications, including potential side effects, and material risks and benefits of taking or refusing the medication." HG § 10–708(e). After the hearing, the panel may authorize administration of the medications prescribed by the physician, as well as alternative medications, only

if the panel determines that:

(1) *The medication is prescribed by a psychiatrist for the purpose of treating the individual's mental disorder;*

(2) The administration of medication represents a reasonable exercise of professional judgment; and

(3) Without the medication, the individual is at substantial risk of continued hospitalization....

HG § 10–708(g) (emphasis added).

If the panel approves the forced medication, the patient has 24 hours to appeal the panel's decision to the OAH. If appealed, the panel's decision is automatically stayed pending resolution by the OAH. HG § 10–708(k). The OAH then must hold a de novo hearing within 7 days, and the decision of the ALJ is deemed the final agency decision for the purposes of judicial review in the circuit court. *Id.*

Under HG § 10–708(*l* ), either the individual or the facility, represented by DHMH, may appeal the ALJ's decision to the circuit court within 14 days of the ALJ's decision, pursuant to

SG § 10–201. Under SG § 10–222(e)(2), either the OAH or the circuit court may stay the decision of the OAH pending resolution in the circuit court. Thereafter, the circuit court "*shall* hear and issue a decision on an appeal *within 7 calendar days from the date the appeal was filed.*" HG § 10–708(*l* )(4) (emphasis added). Nevertheless, nothing in HG § 10–708 expressly authorizes the imposition of sanctions for a violation of any of these provisions.

### III. Mootness

DHMH contends, based on the fact that the ALJ's order has already expired, that Beeman's issues are moot and so we should not reach them. Although we agree that all issues are moot, we believe Beeman's substantive issues are sufficiently important so that we shall elect to reach them, notwithstanding their mootness. We explain.

Whether the CRP properly approved Beeman's forced medication is clearly moot because the ALJ's order expired ninety days after issuance. Even if we were to agree with Beeman's contentions, we cannot undo the fact that the medication has already been administered. Nor has there been a declaration or permanent adjudication of rights, binding upon anyone at any future hearings, that we could reverse. Accordingly, even if we were to agree with her propositions of law, there is no remedy available to her.

As a general proposition, courts of appeal "do not sit to give opinions on abstract propositions or moot questions; appeals which present nothing else for decision are dismissed as a matter of course." *In re Riddlemoser*, 317 Md. 496, 502, 564 A.2d 812 (1989).

> A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.

*Att'y Gen. v. Anne Arundel Co. Sch. Bus Contractors Ass'n*, 286 Md. 324, 327, 407 A.2d 749 (1979). *See also In re Riddlemoser*, 317 Md. at 502, 564 A.2d 812; *Droney v. Dro-*

*ney,* 102 Md.App. 672, 681, 651 A.2d 415 (1995). Nevertheless, on rare occasions, we reach issues that are otherwise moot. *Id.* at 502–03, 564 A.2d 812. In *Lloyd v. Bd. of Supervisors of Elections,* 206 Md. 36, 111 A.2d 379 (1954), the Court articulated the standard by which moot cases must be measured:

[O]nly where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest, will there be justified a departure from the general rule and practice of not deciding academic questions. . . . [I]f the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between the government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all of these factors concur with sufficient weight.

*Id.* at 43, 111 A.2d 379.

■ Our application of the *Lloyd* standard to the instant case leads us to conclude that our review is appropriate. Without doubt, the forced administration of medication clearly concerns "a relationship between the government and its citizens." We are also satisfied that it is a matter of important public concern to ensure that forced medication of hospitalized patients is conducted in a manner that is neither arbitrary nor capricious. *See Williams v. Wilzack,* 319 Md. at 509–10, 573 A.2d 809 (patients' interest against arbitrary and capricious forced administration of medication is protected by constitutional due process rights). Moreover, neither party has referred us to a plethora of cases on the issues here; to the contrary, our research reflects a paucity of authority on this important and developing topic.

In addition, the issue is one that is likely to recur. The parties do not dispute that Beeman's disorder is generally resistant to treatment, and that the severity of her symptoms

depends upon the regularity with which she takes her medication. According to DHMH, Beeman is presently taking medication voluntarily on an out-patient basis, and the need for further forced treatment is speculative. But if Beeman fails to take her medication regularly, as she asserts has happened before, the disorder may resurface and she may need further involuntary treatment.

Finally, if this issue were to recur, it may again evade judicial review. We note that no one requested the ALJ to stay its decision, although the ALJ had the authority to do so. SG § 10–222(e)(2). Similarly, the circuit court could have stayed the forced administration of medication. *See* Md. Rule 7–205 (stay of ALJ's order); Md. Rules 2–632(a, e), 8–422 (stay of circuit court's order). But Beeman had no absolute right to a stay, and it is possible that neither the court nor the ALJ would grant one. Indeed, this point is underscored by the fact that Beeman's motion in the circuit court for a stay of the ALJ's order apparently was never even addressed. Since any order for forced treatment must expire in 90 days, HG § 10–708(m), even an expedited appeal is not sufficiently swift to assure review of an order authorizing forced administration of antipsychotic medications. This issue "may frequently recur, and ... because of inherent time constraints, may not be able to be afforded complete appellate review." *Att'y Gen. v. Anne Arundel Co. Sch. Bus Contractors Ass'n*, 286 Md. at 328, 407 A.2d 749.

We turn next to the merits of appellant's case.

## IV. The Approval of Medications

### A. Side–Effect Medications

Psychotropic medications,[4] such as Haldol and Depakote, often trigger "parkinsonism," a side effect in which the patient

---

**4.** A "psychotropic" medication is one that acts upon the mind or psyche. THE NEW WEBSTER'S MEDICAL DICTIONARY 199 (1988).

exhibits the symptoms of Parkinson's disease.[5] Antidyskinetic medications,[6] such as Cogentin, treat some of the side effects of the psychotropic medications, such as parkinsonism, but do not treat the symptoms of the underlying psychosis.

Beeman strenuously protests the decisions of the CRP and the ALJ to authorize antidyskinetic medications. She argues that HG § 10–708(g) expressly confines the power of a CRP to authorize forced administration of neuroleptic medicines that directly treat a mental disorder, but does not permit authorization of medicines that counter side effects caused by the antipsychotic medicines. DHMH argues against such a narrow construction of HG § 10–708(g). It contends, too, that in the treatment of any mental disorder, antidyskinetic medications are prescribed part and parcel with psychotropic medications, as they comprise interrelated components of the total treatment of the mental disorder. In light of HG § 10–101, which defines the terms under which HG § 10–708 operates, we agree with DHMH.

Our analysis begins with the interpretation and application of the statutory language in HG §§ 10–101 and 10–708. In *Mazor v. State Dep't of Correction*, 279 Md. 355, 369 A.2d 82 (1977), the Court succinctly stated the principles of statutory construction:

> [T]he cardinal rule of construction of a statute is to ascertain and carry out the real intention of the Legislature. The primary source from which we glean this intention is the language of the statute itself. And in construing a statute we accord the words their ordinary and natural signification. If reasonably possible, a statute is to be read

---

**5.** Parkinson's disease is defined as "a chronic, slowly progressive nervous disorder characterized by muscular rigidity, tremors, drooling, restlessness, peculiar involuntary movements, shuffling gait, chewing movements and protrusion of the tongue, blurred vision, and other neurological symptoms." THE NEW WEBSTER'S MEDICAL DICTIONARY 176.

**6.** "Dyskinesia" refers to "any of a number of diseases [that] produce defective voluntary movements [or] impairment of normal movement." THE NEW WEBSTER'S MEDICAL DICTIONARY 68.

so that no word, phrase, clause or sentence is rendered surplusage or meaningless. Similarly, wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences. Moreover, if the statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature.

*Id.* at 360–61, 369 A.2d 82. Indeed, "a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation." *Harris v. Baltimore*, 306 Md. 669, 673, 511 A.2d 52 (1986) (interpreting the interplay of certain pension disability benefits with WCA disability benefits). *See also, Frank v. Baltimore County*, 284 Md. 655, 658, 399 A.2d 250 (1978) (same).

In HG § 10–708(a)(3), " 'Medication' means psychiatric medication prescribed for the treatment of a mental disorder." The definition of a "mental disorder," as defined in HG § 10–101(h), includes any "behavioral or emotional illness that results from a psychiatric *or neurological disorder."* (Emphasis added). Section 10–101(k) defines "treatment" as "any professional care or attention that is given in a facility ... to improve or to prevent the worsening of a mental disorder." By definition, parkinsonism is a *neurological disorder* and it surely causes behavioral illness. Thus, *a priori,* "treatment" necessarily includes "professional care or attention ... to improve or prevent the worsening" of parkinsonism, which is a neurological disorder causing "behavioral or emotional illness."

Moreover, common sense dictates that drugs treating side effects, to the extent they make primary treatment more effective, tend to improve or prevent the worsening of the mental disorder itself, even if the side-effect medications do not directly treat the symptoms of the disorder. The psychotropic medicines in question often entail severe neurological side effects. If Beeman's doctors cannot treat these side effects, the utility of the psychotropic medications in making Beeman better obviously will decrease in proportion to the severity of the side effects the medicines cause. Therefore,

assuming the psychotropic medications are, indeed, necessary for the treatment of schizo-affective disorder, the antidyskinetic medications clearly are necessary as well. Consequently, we conclude that nothing in HG §§ 10–101 and 10–708 limit the panel's power to approve the forced administration of antidyskinetic drugs to treat the side effects of appropriate psychotropic medications.

Finally, as DHMH notes, Beeman's interpretation would render HG § 10–708 surplusage by effectively destroying the usefulness of the CRP. Even after acquiring CRP approval for forced administration of psychotropic medications, doctors still would have to secure appointment of a guardian in the circuit court (Md.Code Ann., Est. & Trusts Art. Title 13 (1991)) in order to treat fully the patient by giving side-effect medications. If faced with the inevitability of petitioning for appointment of a guardian, CRP approval becomes unnecessary; once a guardian is appointed, the guardian can approve all such medications. Surely, the Legislature would not have so circumscribed the power of the CRP as to render it virtually useless. Moreover, "there certainly is no reason to think judges or juries [or guardians] are better qualified than appropriate professionals in making [medical] decisions." *Wilzack*, 319 Md. at 496, 573 A.2d 809 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322–23, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982)).

### B. Range and Dosages of Medications Authorized

Beeman takes issue with the breadth of the panel's authorization. She relies on an observation made by the Court in *Wilzack:*

> By enacting § 10–708, the General Assembly changed the common law [requirement of consent prior to medical treatment] by legislating a *narrow exception* to permit nonconsensual medication of a patient involuntarily committed by court order to a psychiatric facility when the medication is approved by a clinical review panel of health care professionals consistent with statutorily prescribed criteria.

319 Md. at 494, 573 A.2d 809 (emphasis added; *construing* earlier version of HG § 10–708).

Beeman raises two grounds upon which she contends the CRP overstepped its authority under the "narrow exception" carved by HG § 10–708. First, she objects to the broad scope of medications that the CRP approved; it authorized sixteen different medications constituting, according to Beeman, almost every conceivably relevant pharmaceutical. She argues that the CRP's order was particularly egregious because Dr. Ehlers only sought approval of three specific medications. Second, Beeman challenges the wide range of dosages of each medication approved by the panel, up to the maximum dosage that the panel could have authorized.[7] For support, she points to HG § 10–708(*i*)(3), which requires the panel, if it approves forced medication, to specify in its decision "[t]he medication or medications approved and the dosage and frequency range...."[8]

### 1. Range of Medications

As noted, HG § 10–708(g) authorizes the panel to "approve the administration of medication or medications *and may recommend and approve alternative medications....*" (Em-

---

**7.** Although there is no discernible evidence in the record as to the maximum dosages for the medications in issue, appellee does not contest Beeman's assertion that the CRP approved administration of up to the maximum medical dosages.

**8.** Beeman also claims that the panel was acting as a "rubber stamp" of the psychiatrist, based on the fact that the panel approved forced administration of Depakote, a drug that presently can only be administered orally. Initially, we note that even if Depakote cannot be administered forcibly, it does not follow that the panel could not authorize its administration as part of a forced treatment plan. This is particularly true when, as here, the panel specified alternative treatments which accounted for the patient's refusal of oral medications. Accordingly, we do not agree with Beeman that this fact necessarily indicates that either the panel or the ALJ was acting as a "rubber stamp." Additionally, the claim that the ALJ's decision was a "rubber stamp" essentially challenges the sufficiency of the evidence, an issue we cannot address, because of the state of the record.

phasis added). The CRP's authority is not unrestricted, however. In authorizing approval, the CRP must find as follows:

(1) The medication is prescribed by a psychiatrist for the purpose of treating the individual's mental disorder;

(2) The administration of medication represents a reasonable exercise of professional judgment; and

(3) Without the medication, the individual is at substantial risk of continued hospitalization....

HG § 10–708(g). Additionally, "A panel may not approve the administration of medication where alternative treatments are available and are acceptable to both the individual and the facility personnel who are directly responsible for implementing the individual's treatment plan." § 10–708(h)(3).

We cannot resolve whether the ALJ lawfully authorized such a wide list of medications, because of the state of the administrative record and the parties' dispute as to whether there were any available alternative treatments acceptable to both parties. We agree with appellant, however, that the CRP cannot unilaterally authorize a particular medication unless a treating psychiatrist has specifically prescribed it and requested approval of it. Nevertheless, pursuant to HG § 10–708(g), the CRP may approve a series of medications or alternative medications, when requested by a treating psychiatrist, based on the professional judgment of the psychiatrist, so long as the other statutory factors are also satisfied. We believe, therefore, that the CRP has authority under HG § 10–708(g) to approve a *series* of medications, provided that the various requirements of HG § 10–708 are satisfied.

### 2. Dosages of Medications

Beeman claims that the authorization with respect to dosages is so broad that it effectively constitutes a grant of "blanket" discretion to the psychiatrist, which is not allowed under HG § 10–708. She contends that the requirement in subsection ( *i* ), that the panel specify the dosage and frequency range in its decision, constitutes a strict limit on a psychiatrist's discretion, arising out of a patient's "significant constitutional

liberty interest to be free from the *arbitrary* administration of antipsychotic drugs." *Wilzack,* 319 Md. at 508, 573 A.2d 809 (emphasis in original).

We recognize fully the principle articulated in *Wilzack* barring the "*arbitrary* administration of antipsychotic drugs" to patients who have been committed involuntarily. In this light, the contrast between Dr. Ehler's original prescription of three medications, in specified dosages, and the CRP's authorization, gives us pause. We cannot say, because of the condition of the administrative record, that the dosage range approved by the CRP here was either lawful or unlawful. Nor can we determine, because of the deficient record, whether the CRP's approval was, as Beeman claims, a "blanket" endorsement of a "laundry list" of drugs at dangerously high dosages.

 We conclude that there is nothing *inherently* arbitrary and capricious in authorizing a dosage up to the maximum allowable dose. Nevertheless, before a particular dosage or range of dosages may be authorized by a CRP, the medical basis for the dosage must be established by the evidence presented. To justify flexibility with respect to dosages, sufficient evidence to establish medical necessity must be presented to the CRP.

We recognize that, in certain situations, the psychiatrist may not be able to predict with mathematical precision how a patient will respond to a particular dosage. If the CRP is forced to approve dosage ranges that are too narrow to permit rapid adjustment, then a CRP may need to be convened every time the physician wishes to alter the treatment, even slightly, to account for the patient's reaction to the medication. That clearly could interfere with essential medical treatment and, at the same time, it would create an unreasonable burden that we do not believe the Legislature intended subsection (*i*) to impose.

In sum, Beeman contends, and DHMH apparently does not dispute, that the CRP's authorization was far broader, in scope and dosage, than Dr. Ehlers requested. Based on the garbled record, we are unable to ascertain whether Dr. Ehlers

requested authorization for such broad discretion, or even whether such discretion was medically necessary. But if Beeman's contentions are correct, then the approval at issue here exceeded the statutory authority of HG § 10–708. This is because a CRP's authorization to administer a "laundry list" of pharmaceuticals, and its "blanket" authorization to administer unnecessarily high dosages, in the *absence* of a request by the treating physician, violates HG § 10–708.

## V. Procedural Issues

■ Beeman complains that the circuit court made two reversible procedural errors. First, she claims the court should have reversed and remanded for further proceedings, based solely upon the fact that the court did not hear and decide the case within the seven-day time frame imposed by statute. Second, once the court discovered that the audiotapes were substantially inaudible, it should have vacated the ALJ's decision and remanded the case for new proceedings, rather than rely on the recollections of counsel.

With respect to the delay in the circuit court hearing, we are unaware of any provision in the APA that authorizes reversal as a *sanction;* § 10–222(h) only permits reversal if, because the ALJ's decision was infected by one of the six specific grounds, it prejudices the petitioner's rights. Nor does HG § 10–708 provide any authority for the proposition that reversal is available as a sanction for noncompliance. *See also Motor Vehicle Admin. v. Shrader,* 324 Md. 454, 462, 597 A.2d 939 (1991) (noncompliance with mandatory procedure specified by statute does not necessarily require dismissal of the case, provided the statute does not so require).

Even if the circuit court should have remanded for further proceedings, or assuming reversal were available as a sanction, Beeman's procedural claims are now moot. The ALJ's order expired on its own terms ninety days after the OAH issued the opinion, and no one requested a stay of that decision. Reversal and remand are no longer feasible after ninety days because the ALJ's order was completely carried out and could not be undone. Likewise, requiring the ALJ to take further testimony, so that the circuit court could mean-

ingfully review the ALJ's decision, would now be unproductive.[9] Thus, reversing the circuit court on either procedural ground would now be pointless.

In contrast to appellant's substantive issues, we do not believe her procedural questions deserve consideration in spite of their mootness. Specific procedural irregularities in a single case, unlike forced medication of mentally ill patients, do not concern matters of important public interest. Nor has Beeman proffered any basis that would permit us to conclude that the procedural errors in question are particularly likely to recur in any subsequent hearings. Finally, such procedural irregularities are not necessarily likely to evade judicial review. Accordingly, we decline to reach the merits of the moot procedural issues.

**APPEAL DISMISSED. COSTS TO BE PAID ONE-HALF BY APPELLANT AND ONE-HALF BY APPEL-LEE.**

---

9. Certainly, we do not suggest that, once the circuit court discovered that the audiotapes were garbled, the court was correct in relying on counsels' recollections as a supplemental basis for reviewing the ALJ's factual findings. Under SG § 10–222(f)(1), "Judicial review of disputed issues of fact *shall be confined to the record* [emphasis added]," except as provided in that subsection. In the absence of a stipulation as to the evidence or the facts, if the court cannot find substantial evidence *in the record,* the court cannot affirm.