691 A.2d 252

David MARTIN

v.

DEPARTMENT OF HEALTH AND MENTAL HYGIENE.

No. 851, Sept.Term, 1996.

Court of Special Appeals of Maryland.

March 27, 1997.

Kelly Bagby (Cathy S. Surace, on the brief), Largo, for Appellant.

David R. Morgan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Argued before WENNER, DAVIS and HOLLANDER, JJ.

WENNER, Judge.

We are here called upon to consider the extent to which an individual involuntarily committed to a State psychiatric facility may be involuntarily medicated. Appellant is David Martin (Martin), and appellee is the Department of Health & Mental Hygiene (DHMH). On appeal, we are asked to consider the following questions:

    (1)  whether Md.Code Ann., Health–Gen. Art. ("HG") § 10–708 (1994 Repl. Volume & 1996 Supp.) requires that an individual be currently dangerous to himself or others

within the facility to which he is confined before he can be administered psychotropic drugs against his will; and

(2) whether an involuntary psychiatric patient's constitutionally protected right to refuse psychotropic drugs can be overcome solely because the drugs are medically appropriate to treat him.

We shall respond to the first question in the affirmative, and reverse the judgment of the circuit court. Consequently, we need not address the second question.

## Facts

On 11 June 1995, Martin was involuntarily committed to the Crownsville Hospital Center (Crownsville), a State psychiatric facility. The individual was found by an Administrative Law Judge (ALJ) to present a danger to his life or safety or of others. Md.Code (1994 Repl.Vol. & 1996 Supp.), § 10–632 of the Health–Gen. Article ("HG"). While in Crownsville, Martin refused to be administered the prescribed medications.

After Martin for three weeks refused to ingest the psychotropic drugs prescribed for him, a Clinical Review Panel (CRP) was convened, pursuant to HG § 10–708, to determine whether he should be forcibly medicated. Following a hearing at which it reviewed his treatment plan and prescribed medications, the CRP approved of Martin being forcibly medicated for a period of ninety days. Martin noted an appeal to the Office of Administrative Hearings (OAH).

At a hearing before an ALJ, Dr. Silverine Samaranyake, Martin's attending physician, testified that, while at Crownsville, Martin had neither been a danger to his life or safety, nor to Crownsville's staff or other residents. Moreover, Martin had not required acute behavioral interventions, such as seclusion, restraints, suicidal or homicidal precautions, or emergency medications. In fact, Martin had been passive while at Crownsville, spending a good deal of time alone in his room reading his Bible. While Dr. Samaranyake was of the opinion that the prescribed medication would enable Martin to be discharged from Crownsville, he believed that, without

being medicated, Martin would remain mentally ill and hospitalized "for a long, long time."

After considering all of the evidence presented, the ALJ affirmed the decision of the CRP that Martin should be forcibly medicated for a period of ninety days, believing that unless forcibly medicated Martin presented a danger to his life or safety or others upon being discharged from Crownsville.

Martin then noted an appeal to the Circuit Court for Anne Arundel County, which affirmed the ALJ's decision. This appeal followed. In the meantime, after having been forcibly medicated, Martin was discharged from Crownsville to a community residential program.

### Mootness

As we have noted, we must here determine whether, in order to be forcibly medicated, an involuntarily committed individual must present a danger to his life or safety, or others, in the facility to which he has been confined, or present a danger to his life or safety or others upon being discharged from the facility.

We begin by noting that "[g]enerally, appellate courts do not decide moot questions. A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Att'y Gen. v. Anne Arundel County Bus Contractors Ass'n,* 286 Md. 324, 327, 407 A.2d 749 (1979) (citations omitted). As Martin has been forcibly medicated and discharged to a community residential program, the matter before us is moot.

Although there may no longer be any controversy between the parties and no effective remedy which we can provide, *Beeman v. Dep't of Health,* 107 Md.App. 122, 133, 666 A.2d 1314 (1995) (hereinafter referred to as "Beeman II"), there are "instances in which courts will depart 'from the general rule and practice of not deciding academic questions.'" *Id.,* quoting *Lloyd v. Bd. of Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379 (1954). In Lloyd, the Court of Appeals articulat-

ed the appropriate standard for determining whether an issue otherwise moot may be considered:

"[O]nly where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest, will there be justified a departure from the general rule and practice of not deciding academic questions. . . . [I]f the public interest clearly will be hurt if the question is not immediately decided, if recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely to prevent a decision then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight."

In re Riddlemoser, 317 Md. 496, 564 A.2d 812.

■ Applying the *Lloyd* standard, we conclude that we are justified in addressing the issues before us, because "the forced administration of medication clearly concerns 'a relationship between the government and its citizens.'" *Beeman v. Dep't of Health,* 105 Md.App. 147, 158, 658 A.2d 1172 (1995) (hereinafter referred to as "Beeman I"). "We are also satisfied that it is a matter of important public concern to ensure that forced medication of hospitalized patients is conducted in a manner that is neither arbitrary nor capricious." *Id.*

Further, such issues will likely recur, requiring judicial review. Thus, we believe it to be of public importance for us to determine under what circumstances an involuntarily committed individual may be forcibly medicated, particularly because such individuals may suffer from a mental illness not only resistant to treatment, but which is likely to recur.

As forcibly medicating such individuals is generally for a fixed and relatively short period of time, "if this issue were to recur, it may again evade judicial review." *Beeman I,* 105 Md.App. at 159, 658 A.2d 1172.

## Standard of Review

"The scope of review on appeal to this Court is essentially the same as the circuit court's scope of review. We must review the administrative decision itself." *Beeman I,* 105 Md.App. at 154, 658 A.2d 1172 (citations omitted). Judicial review of an ALJ's decision is governed by the provisions of the Administrative Procedure Act (APA), Md.Code (1995 Repl. Volume & 1996 Supp.) § 10–222, State Gov. Art. (SG). According to § 10–222(h), "in a proceeding under this section, the Court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

    i.    is unconstitutional;

    ii.   exceeds the statutory authority or jurisdiction of the final decision maker;

    iii.  results from an unlawful procedure;

    iv.  is affected by any other error of law;

    v.   is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

    vi.  is arbitrary or capricious."

"Where the question on appeal is the sufficiency of the evidence to support a decision, we must determine 'whether a reasoning mind could have reached the factual conclusion reached by the agency.'" *Beeman I,* 105 Md.App. at 155, 658 A.2d 1172, quoting *Supervisor of Assessments of Montgomery Co. v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625, 547 A.2d 190 (1988). "When the issues concern interpretation of federal and Maryland statutes, however, we afford the agency no such deference." *Id.* This is precisely what is now before us.

## Statutory Background

In resolving the issues before us, we must interpret the provisions of HG § 10–708. Martin challenges the application of § 10–708, not its constitutionality. Accordingly, we must consider § 10–708(g)(3)(i)'s requirement that a CRP may:

> "approve the administration of medication or medications ... if the panel determines that ... without the medication, the individual is at substantial risk of continued hospitalization because of ... remaining seriously mentally ill with no significant relief of the mental illness symptoms that cause the individual to be a danger to the individual or to others;...."

Put another way, we must resolve the meaning of the phrase "cause the individual to be a danger to the individual or to others," to which we now turn.

## The Dangerousness Requirement

According to Martin, the circuit court erred in interpreting the phrase in question as permitting an individual to be forcibly medicated on determining the individual to be a danger to the individual or to others upon being discharged from Crownsville. As Martin sees it, an involuntarily committed individual may be forcibly medicated only upon it being determined that without medication the individual is a danger to the individual or to others in Crownsville. We agree.

As the Court of Appeals pointed out in *Mazor v. State Dep't of Correction*, 279 Md. 355, 369 A.2d 82 (1977):

> [T]he cardinal rule of construction of a statute is to ascertain and carry out the real intention of the Legislature. The primary source from which we glean this intention is the language of the statute itself. And in construing a statute we accord the words their ordinary and natural signification. If reasonably possible, a statute is to be read so that no word, phrase, clause or sentence is rendered surplusage or meaningless. Similarly, wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences. Moreover, if the

statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature.

279 Md. at 360–61, 369 A.2d 82.

■ Upon applying these principles, we agree with Martin that § 10–708(g)(3)(i) permits forcible medication of an individual only if, without medication, the individual is a danger to himself or to others in Crownsville.

We believe that the requirement of § 10–708(g)(3)(ii) that an individual remain "seriously mentally ill for a significantly longer period of time . . . [causing] the individual to be a danger to the individual or to others in order to be forcibly medicated" is significant. When considering its language, we believe § 10–708(g)(3)(i) was enacted in the present tense to require a CRP to determine that, without medication, an individual is a danger to the individual or to others in the facility to which he has been involuntarily confined. Otherwise, we believe the General Assembly would have employed the future tense. Under such circumstances, it would be necessary for a CRP only to determine that forcible medication would improve an involuntarily committed individual's condition.

Moreover, "[w]hen several statutes are made in pari materia, any interpretation must be made with full awareness of all the relevant enactments. It is presumed that the General Assembly acted with full knowledge of prior legislation and intended statutes that affect the same subject matter to blend into a consistent and harmonious body of law. Therefore, various consistent and related enactments, although made at different times and without reference to one another, nevertheless should be harmonized as much as possible." *State v. Bricker*, 321 Md. 86, 93, 581 A.2d 9 (1990) (citations omitted).

Consequently, we shall harmonize §§ 10–708(g)(3)(i) and 10–632(e)(2)(iii) as much as possible. Section 10–632(e)(2)(iii) permits an individual to be involuntarily admitted only if "[t]he individual presents a danger to the life or safety of the individual or of others."

In harmonizing §§ 10–708 and 10–632 as much as possible, we conclude that § 10–708 permits forcible medication of an individual only upon a CRP determining that the individual is a danger to the individual or to others in the facility to which he has been involuntarily confined. This is so because for an individual to be involuntarily committed, § 10–632(d)(2)(iii) requires it to be determined that "[t]he individual presents a danger to the life or safety of the individual or of others." Consequently, if we were to interpret § 10–708(g)(3)(i) as urged by appellee, §§ 10–708(g)(3)(i) and 10–632(d)(2)(iii) would be redundant.

In other words, harmonizing these sections as much as possible ensures that a mentally ill individual may only be involuntarily committed to a psychiatric facility if it is determined that the individual presents a danger to the life or safety of the individual or to the community. Such an individual may only be forcibly medicated, however, upon it being determined that the individual presents a danger to the individual or to others in the facility to which he has been involuntarily confined. We do not believe this was the intent of the General Assembly. Otherwise, § 10–708(g)(3)(i) would be both redundant and meaningless. Such an interpretation would be contrary to the cardinal rule of statutory construction. *See Mazor*, 279 Md. at 360, 369 A.2d 82.

■ In any event, we believe it obvious that it was the intent of the General Assembly to ensure that involuntarily admitted mentally ill individuals be forcibly medicated only when all else fails. As "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," *Washington v. Harper*, 494 U.S. 210, 229, 110 S.Ct. 1028, 1040, 108 L.Ed.2d 178 (1990); *Riggins v. Nevada*, 504 U.S. 127, 134, 112 S.Ct. 1810, 1814–15, 118 L.Ed.2d 479 (1992), such individuals must be afforded substantial protections. It was no doubt with this in mind that § 10–708(g)(3)(i) was enacted. As we presume the General Assembly intended that § 10–708(g)(3)(i) have independent meaning, *Bricker*, 321 Md. at 93, 581 A.2d 9, we

conclude that an individual must be determined "to be a danger to the individual or others" in the facility to which the individual has been involuntarily committed before being forcibly medicated.

We point out that § 10–708(g)(3)(i) is used only when seeking forcibly to medicate an involuntarily committed individual; that is, an individual already determined, pursuant to § 10–632, to be a danger to himself or to others. In other words, in considering § 10–708(g)(3)(i), we must bear in mind that such an individual has been involuntarily committed after being determined, pursuant to § 10–632, to be a danger to himself or to others in the community from which the individual has been involuntarily removed.

Moreover, permitting such an individual to be forcibly medicated simply because the individual may be a danger to himself or to others if ultimately released from the facility, would obviate the intent of the General Assembly. We believe the General Assembly intended to enact a comprehensive scheme to ensure that such individuals be forcibly medicated only if determined to be a danger to the individual or to others in the facility to which the individual has been involuntarily admitted, and provided no less intrusive means are available. Otherwise, the General Assembly's scheme for the protection of such individuals could be easily avoided.

We also believe it noteworthy that § 10–708(g)(3)(i) was enacted in 1991, following *Williams v. Wilzack*, 319 Md. 485, 509–10, 573 A.2d 809 (1990). According to the *Wilzack* Court, "§ 10–708 violated procedural due process protections guaranteed by both the State and Federal Constitutions." Although the legislative history of § 10–708(g)(3)(i) fails to reveal the rationale behind adding the disputed clause, we believe it was to afford such individuals additional procedural due process. Thus, to adopt appellee's interpretation of § 10–708(g)(3)(i) would be to nullify its enactment.

In sum, we hold that in order to be forcibly medicated, § 10–708(g)(3)(i) requires that a CRP determine that an involuntarily committed individual is a danger to the individual or

others in the facility to which he has been involuntarily admitted. Consequently, we shall reverse the judgment of the circuit court.

**JUDGMENT REVERSED.**

**COSTS TO BE PAID BY APPELLEE.**