738 A.2d 923

**Laudie J. BAER**

v.

**Marvin L. BAER.**

**No. 1730, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Oct. 7, 1999.

Harrell, J., filed a concurring opinion.

---

William M. Ferris (Krause & Ferris on the brief), Annapolis, for appellant.

Gerald C. Ruter, Baltimore, for appellee.

Argued before HARRELL,* HOLLANDER and ADKINS, JJ.

ADKINS, Judge.

On August 8, 1994, Marvin L. Baer, appellee, filed a complaint for an absolute divorce from Laudie J. Baer, appellant, in the Circuit Court for Anne Arundel County, based upon a voluntary separation. On January 25, 1996, the court approved a marital separation agreement entered into by the parties, calling for, *inter alia,* modifiable rehabilitative alimony. Mrs. Baer was granted an absolute divorce on April 1, 1996, which incorporated the previous agreement. Mrs. Baer subsequently filed a series of motions, including a motion to modify the aforementioned alimony. After a hearing on the motions, the trial court denied appellant's request for modification of alimony. This appeal was timely filed.

Mrs. Baer asks us to consider whether the trial court abused its discretion in denying a modification of alimony: 1) on the basis that she would not undergo treatment with the recommended type of psychotropic medications for her depression that prevented her from full-time employment; and 2) by not considering her unexpected surgeries for colon cancer and the associated incapacity and recovery period.

## FACTS AND LEGAL PROCEEDINGS

The parties were married in 1983, when Mrs. Baer was 43 years of age and Mr. Baer was 49 years of age. No children were born as a result of their marriage. In July 1993, the parties voluntarily separated, and on August 8, 1994, Mr. Baer filed for a divorce. On November 13, 1995, at a scheduled hearing date, the parties announced that they had reached an

---

* Harrell, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court; he participated in the adoption of this opinion as a member of this Court by special designation.

agreement covering property and support issues, which they read into the record. At that time, they agreed that neither party would proceed to obtain a divorce until after January 1, 1996.

On January 23, 1996, the trial court signed an order incorporating all of the terms of the parties' agreement according to the terms announced at the November hearing. This order included provisions for payment of "modifiable rehabilitative alimony" to Mrs. Baer for five years from January 1, 1996. The alimony was to be paid at a rate to be determined by a formula, not to exceed $4,000 per month, until the parties' marital home was sold. The formula called for payment of the two mortgages on the parties' marital home, the utilities, and $430 per month in cash to Mrs. Baer. After the house was sold, Mr. Baer would pay alimony of $2,500 per month through 1998, and thereafter at the rate of $1,500 per month until the end of the year 2000. Mrs. Baer also received a $36,777 distribution from Mr. Baer's University of Maryland pension, and a small portion of his military pension, to be paid monthly. Mr. Baer agreed to pay Mrs. Baer's health insurance through the end of the year 2000, assumed marital debts of $48,000, and paid $4,500 in counsel fees for Mrs. Baer.

Mrs. Baer opposed the entry of the January 1996 order, asserting in a January 25, 1996 letter to the court that the November 1996 agreement was not equitable, and that she did not "understand and appreciate what she was agreeing to." The court nevertheless signed the order incorporating the agreed terms and included a handwritten note that stated: "Since the order comports with the transcript, it has been signed." A judgment for absolute divorce was entered on April 1, 1996, incorporating the terms of the January 23 order. No appeal was taken from this judgment.

Beginning in March 1997, after the marital home had been sold,[1] Mrs. Baer filed a series of motions regarding the

---

**1.** Although the parties agreed in the 1996 agreement that the house would be sold by April 1, 1996, it was not sold by such date. The house

alimony called for in the January 1996 order, including requests to: 1) increase and extend the rehabilitative alimony because of her ongoing recovery from colon cancer; and 2) to award indefinite alimony because even after recovery from the surgeries, she could not "attain a standard of living which is not unconscionably disparate with that of" Mr. Baer. Mrs. Baer's motions were heard on June 10 and 11, 1998, in the circuit court.

## Factual Background

Mr. Baer is a board certified prosthodontist. After retiring from the dental corps of the United States Air Force, he served as an Associate Professor at the University of Maryland Dental School and maintained a part-time dental practice. At the time of the hearing in this case, Mr. Baer was earning a gross annual salary of $81,628 from the University, plus $55,668 in retirement pay from the Air Force. For the year 1997, he also earned an additional $20,368 from his part-time "faculty practice" of dentistry. After 1997, income from his part-time dental practice decreased because he cut back his working hours.

Mrs. Baer holds a doctorate in research chemistry, and when the parties were married, she was employed as a research chemist at the Naval Research Laboratory. She was terminated from that position in 1983, for failure to complete an assignment. Since then, she was employed, sporadically, as a ski instructor, a yoga instructor, and a lifeguard. At the time of the hearing, she was working one or two days as a massage therapist at the University of Maryland Health Center, earning $34 per hour. Her pay depended upon the number of patients she treated daily. Her monthly income in the spring of 1998 was estimated to be $170 from her employment, $126 from Mr. Baer's Air Force retirement, and $1,500 in alimony.

---

was sold at a mortgage foreclosure proceeding on November 22, 1996, following Mr. Baer's July 23, 1996 declaration of bankruptcy, and apparently the parties received no net proceeds from the sale of the house. After the foreclosure, Mrs. Baer also filed bankruptcy.

In February 1995, Mrs. Baer was diagnosed with colon cancer. Although several of the physicians she consulted regarding her cancer recommended surgery, she declined surgery, believing that she could overcome the cancer with homeopathic medications and proper diet. In July 1997, her cancer caused her colon to rupture, and she underwent emergency surgery to remove the cancer and part of her colon. As a result of that episode, she was unable to work from July 1997 through September 1997. In October and November 1997, she worked as a message therapist, but only one day a week, that being all she "could handle."

In December 1997, she required additional surgery, a reverse colostomy, and as a result, was unable to work for two months. In March 1998, she resumed her position as a message therapist on the two days per week schedule she maintained at the time of the hearing. She testified that in June 1997, her recent surgery was still affecting her ability to work, as she was still in the recovery process. She also said that the surgery caused adhesions to form in her intestines and nerve damage to her pelvic area, and she was undergoing acupuncture treatments for the latter condition.

Mrs. Baer has a history of mental health problems, dating from her teenage years. She attempted suicide once as a teenager and twice while an adult attending graduate school. As an adult, she was hospitalized three times for depression, and was under the care of a psychiatrist for various periods during her life. During the five years preceding the hearing below, she was not under a psychiatrist's care.

She began consultations with a psychologist, Dr. Thomas Muha, on January 8, 1997. Dr. Muha opined that she suffers from "severe recurring depression with psychotic features." He described her psychotic features as an episodic difficulty "being able to assess the reality of situations that she is facing and that significantly impairs her judgment," and gave as an example her refusal to undergo surgery to remove the cancer in her colon despite the recommendation of multiple doctors. He also testified that her depression causes her to have a low

energy level, and "her tolerance for stress is absolutely minimal." Dr. Muha opined that with appellant's stress level and chronic fatigue, she was limited in the extent that she could work, and "one or two days [per week] would probably be the optimal level at which she can function." Dr. Muha also opined that the prognosis for recovery is "not good," and that "there's an 80 percent probability that she's going to continue to have severe problems."

Dr. Muha indicated that there are medications that would be appropriate for the depression suffered by Mrs. Baer, but declined to express an opinion regarding the identity of those medications, saying: "I am not a medical doctor, so I am not qualified to answer that. . . ." He reported, however, that "I certainly suggested, recommended, referred, and encouraged her to speak to her physicians about that. She did, in fact, at my urging, do that." It was his opinion that even if she used additional medications, she would be unlikely to stay on the proper dosage, and so would experience problems.

Dr. Stephen Siebert, a psychiatrist, testified for Mr. Baer regarding Mrs. Baer's mental health. He reviewed her medical history, and had a two-hour meeting with her to determine her current state of mind and current level of functioning. His conclusion was that, although she exhibited no current symptoms during their meeting, her records presented evidence of a bipolar disorder. He explained bipolar disorder. He differentiated his diagnosis from that of Dr. Muha by explaining:

> If a person has a manic episode at any time in their life, it would be most appropriately—result in a diagnosis of a bipolar disorder, not a recurrent depressive disorder as Dr. Muha has offered . . . this condition is a very readily treatable condition. . . . This is one of the few conditions . . . in all of psychiatry where we can actually prevent the symptoms of the illness.
>
> We can prevent hospitalizations. We can prevent the psychosis. We can prevent the depressive episodes. We can prevent manic episodes. There are treatments that will

maintain mood stability, allow a person to cope with the normal stresses of life, and allow people to function in a normal way.

Dr. Siebert opined that a relatively new class of medications referred to as "mood stabilizers" would benefit Mrs. Baer,[2] and indicated that her records reflected that she had not taken any of these medicines, with the exception of lithium, in the past. He recommended that these be combined with antidepressant medications, and that she should be monitored regularly by a psychiatrist. He explained that most of the medicines that he recommended were only recently introduced, and were not available five years ago, when she was last treated by a psychiatrist. He further opined that the fatigue that is caused by her depression "could be regulated or could [be] improved with appropriate medications."

Dr. Siebert expressed his belief that "she has denied herself from [sic] competent and reasonable medical treatment that is readily available in this area in terms of treatment for depression, for low energy and for mood stabilization." He acknowledged that she presently takes zoloft, an antidepressant medication of the type that he recommended, but that her dosage was not sufficiently high to help her. Further, he opined that she should not be taking an antidepressant without simultaneously taking a mood stabilizer, as the antidepressant could cause her further problems.

Mrs. Baer testified that she was unwilling to take mood stabilizers, such as lithium, that Dr. Siebert recommended. She explained:

> I have had a number of experiences—two, in which these medical professionals have prescribed that type of medication for me, and they ... weren't very careful about what they did, and it caused me serious harm.

---

2. He specifically recommended the following mood stabilizers: tegretol, depakote, gabapentin, and lamotrigine. He indicated that lithium was a mood stabilizer. He also recommended risperdal or ayprexa as safe medicines for someone who suffers from delusions or paranoia.

And I feel that my life is my responsibility and I'll make the decisions about what medications I should take. And right now I am having a lot of success with the homeopathic medications that [her homeopathic doctor] recommends. And there are no side effects and I am very comfortable with that.

When asked about her specific negative experiences with psychotropic medications, Mrs. Baer described an occurrence in 1993, when a psychiatrist prescribed a medication, unspecified, that "essentially shut down my perspiration mechanism." She explained that she was working as a lifeguard when she took this medication, that her doctor had not advised her that she should avoid exposure to the sun while taking it, and consequently, she became very sick. She also indicated that another doctor had prescribed lithium for her, but had given her too high a dosage and had not properly monitored her with blood tests.

## The Court's Ruling

The trial court, in its written opinion, described appellant's position to be that "her health has not improved as it was originally thought it would, that the income gap is disparate, and that she needs the money." The court agreed that Mrs. Baer's "continuation of her medical condition of major depression would qualify for an extension of alimony" under our decision in *Brashier v. Brashier*, 80 Md.App. 93, 560 A.2d 44 (1989). It further stated:

We agree with Dr. Muha, her psychologist, that she has a severe depression, however exactly defined, and in her present state has difficulty enough working ten hours much less forty hours.... All of this could be proper grounds for further indefinite alimony.

However, there is the problem of treatment. Mrs. Baer does not want to use psychotropic drugs; she claims bad experiences in the past. Dr. Siebert, [Mr. Baer's] expert psychiatrist, notes there are many new medicine's today which do not have the after effect Mrs. Baer complains of. Since use of such drugs is outside the expertise of Dr. Muha, he declined to comment on this, leaving Dr. Siebert's

the only direct testimony on this issue. In addition, there were suggestions that other doctors had recommended medication to Mrs. Baer without success.

Mrs. Baer is entitled to refuse any treatment, just as she did with regard to her cancer, although it almost cost her life. It is her body, and it is within her control. However, if she wants to continue her alimony, she is either going to have to use these drugs or have solid evidence that they would harm her.

While her depression is one of the reasons she rejects these drugs, we believe she is capable of making a free will decision to use or not use such drugs. Since she has refused to use them to date, despite competent evidence they are necessary and that she has been told that, we must deny her petition for an increase.

This does not mean she cannot seek such [medical] relief, and if it fails, seek [an extension of] alimony. She has until the end of the year 2000 to do that. However, on the state of facts as we find them we deny the relief.

Appellant filed a motion to alter or amend the order based solely on her physical condition. In the motion, appellant argued that in focusing on her psychological condition, the court "overlooked the unforseen [cancer] surgeries." By order dated August 13, 1998, the court denied the motion, stating that "it is her refusal to get treatment that has prolonged that part of the case." The court awarded appellant $1,500 in attorneys' fees. Appellant timely filed this appeal.

## DISCUSSION

### I.

### Whether Trial Court Could Base Denial of Petition to Increase Alimony on Mrs. Baer's Refusal to Take Psychotropic Medications to Improve her Mental Health and Increase her Ability to Work

Appellant's first argument is that the trial court abused its discretion by refusing to modify rehabilitative alimony to

indefinite alimony when it simultaneously found that Mrs. Baer had a debilitating mental health condition, and "mandate that she submit to drug therapies, . . . and only then file again for modification if that therapy actually harms her or fails to resolve the problem." She offers five reasons why this decision was an error, which we briefly summarize:

(1) The record does not support the trial court's conclusion that she is capable of deciding to make the decision to submit to taking psychotropic medications.

(2) Without a modification, her income will decrease by 40%, a harsh and inequitable result.

(3) The condition imposed by the trial court will at least result in an unjust interim loss of income while she experiments with the medication and awaits trial on a second case, or at worst, will make her seriously ill.

(4) She was taking an antidepressant medication at trial, and the court should not have conditioned her alimony on a particular "modality of treatment."

(5) "The notion that an individual who suffers from a mental condition that causes or contributes to his or her reluctance to seek treatment for that condition can, on the basis of that reluctance, be refused alimony . . . is patently contrary to reason."

Appellee contends that the trial court did not abuse its discretion in denying the request for modification of the alimony agreed to by the parties.

We agree with appellant that the trial court erred in denying her petition for modification on the grounds of her refusal to take certain psychotropic[3] medications. Our reasons are similar, although not identical, to several advanced by appellant. Because our decision is influenced by common law principles underlying the doctrine regarding the right to bodi-

---

**3.** A " 'Psychotropic' medication is one that acts upon the mind or psyche." *Beeman v. Department of Health & Mental Hygiene,* 105 Md.App. 147, 159 n. 4, 658 A.2d 1172 (1995) (citing *The New Webster's Medical Dictionary* 199 (1988)).

ly integrity and informed consent, we begin our discussion with a review of this topic.

## A.

### The Right to Bodily Integrity and Informed Consent — Forcible Administration of Psychotropic Medications

■ Under our common law "a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient." *Sard v. Hardy*, 281 Md. 432, 438–39, 379 A.2d 1014 (1977). A corollary right is the right to refuse medical treatment. *See Mack v. Mack*, 329 Md. 188, 210, 618 A.2d 744 (1993). These rights are embodied in the law of "informed consent," and the doctrine recognizing an individual's broader right to bodily integrity. *See Cruzan v. Missouri Dept. of Health*, 497 U.S. 261, 271, 110 S.Ct. 2841, 2847, 111 L.Ed.2d 224 (1990) (observing that "most courts have based a right to refuse medical treatment ... solely on the common-law right to informed consent ..."); *Norwood Hosp. v. Munoz*, 409 Mass. 116, 564 N.E.2d 1017, 1021 (1991) (explaining that the right to bodily integrity has developed through the doctrine of informed consent); *In the Matter of Conroy*, 98 N.J. 321, 486 A.2d 1209, 1222 (1985) (stating that "[t]he doctrine of informed consent is a primary means developed in the law to protect [the] personal interest in the integrity of one's body.").

■ A person's right to resist forcible administration of medications implicates a constitutionally protected liberty interest. *See Cruzan*, 497 U.S. at 278, 110 S.Ct. at 2851; *Williams v. Wilzack*, 319 Md. 485, 498, 573 A.2d 809 (1990) ("The liberty interest of a noninstitutionalized mental patient to refuse treatment with antipsychotic drugs was of such importance that it could be overcome only by 'an overwhelming [s]tate interest.'") (quoting *In the Matter of Guardianship of Roe*, 383 Mass. 415, 421 N.E.2d 40 (1981)); *Beeman v. Department of Health & Mental Hygiene*, 105 Md.App. 147, 158, 658 A.2d 1172 (1995) (holding that a person has a signifi-

cant constitutional liberty interest in being free from the arbitrary and capricious administration of psychotropic medicines); *see also Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990).

The Court of Appeals in *Williams* explained the rationale for the heightened protection afforded a patient against forced administration of psychotropic medications. In doing so, the Court quoted the Supreme Court, which articulated that " 'forcible injection of medication into a non-consenting person's body represents a substantial interference with that person's liberty,' since the purpose of the drugs 'is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial [to the individual's] cognitive processes." *Williams,* 319 Md. at 503, 573 A.2d 809 (quoting *Washington,* 494 U.S. at 229, 110 S.Ct. at 1041) (alteration in original).

■ Under the law of informed consent, an adult has the right to refuse treatment, even if the refusal has a detrimental effect, so long as the individual is competent. The Fourth Circuit Court of Appeals explained:

> The very foundation of the doctrine [of informed consent] is everyone's right to forego treatment or even cure if it entails what for him are intolerable consequences or risks, however warped or perverted his sense of values may be in the eyes of the medical profession, or even of the community, so long as any distortion falls short of what the law regards as incompetency. Individual freedom here is guaranteed only if people are given the right to make choices that would generally be regarded as foolish ones.

*United States v. Charters,* 829 F.2d 479, 495 (4 th Cir.1987).

Although courts will respect a competent adult's right to refuse treatment, individuals have been restrained from exercising that right when physical injury to other persons is at risk. Thus, the State may administer psychotropic medications to inmates who are likely to cause harm to themselves or others, provided that there is a medical finding that "a mental disorder exists which is likely to cause [such] harm,"

and constitutional due process is met. *Williams,* 319 Md. at 501, 573 A.2d 809 (citing *Washington,* 494 U.S. at 220–23, 110 S.Ct. at 1036–37); *see also Guardianship of Roe,* 421 N.E.2d at 60 (recognizing a similar rule for noninstitutionalized mentally ill persons).

In the present case, we do not address, directly, the issue presented by the cases mentioned above — the forced administration of psychotropic medicines. Yet in denying appellant's claim for modification of alimony solely because she failed or refused to take a certain modality of psychotropic medications, the court has implicated the principles of the right to bodily integrity and informed consent. The implications from this body of law cause us to apply a more critical eye to the evidence and rationale supporting the trial court's decision.

## B.

### Responsibility for Adverse Consequences of Refusal To Take Medication

There are sometimes adverse effects, with monetary consequences, of a person's refusal·to consent to medical treatment. Courts have infrequently been called upon to determine whether the monetary consequences of a decision should be shared by, or shifted to, another party. We have found three cases which denied monetary relief to a plaintiff who has refused medical treatment, and the refusal had detrimental effects.

In *DeMary v. United States,* 982 F.Supp. 1101 (D.S.C.1997), the Federal District Court held that in determining damages to a plaintiff who survived an airplane accident, a court could consider whether the plaintiff acted reasonably in refusing antidepressant medications to cure his post traumatic stress syndrome. *See id.* at 1111; *see also Franklin v. U.S. Postal Service,* 687 F.Supp. 1214, 1218–19 (S.D.Ohio 1988) (plaintiff's discharge from employment was not a violation of the ADA when she exacerbated her handicap by refusing to take psychotropic medication for her schizophrenia, and her refusal caused her to commit criminally violent actions while on the

job). In *Hart v. City of Jersey City*, 308 N.J.Super. 487, 706 A.2d 256 (App.Div.1998), a New Jersey appellate court denied the tort claims of a police officer against the city, reasoning that his "liberty interest in medical self-determination, including the right to refuse unwanted medical care" was not violated when the officer was required to accept alcohol counseling as a condition of his continued employment. *Id.* at 259. The court pointed out that the plaintiff, as a police officer, had "authoritative sway and access to arms," and had been exhibiting alarming behavior. *Id.* at 260. In considering his right to medical self-determination, it reasoned that "the patient's rights have often been weighed against the interests of others." *Id.*

Sometimes, courts have been willing to shift the monetary consequences of refusal of treatment when the decision is affected by mental illness, even though the patient is competent. In Pennsylvania, courts have held that in negligence suits claiming personal injury, a plaintiff is not required to comply with the normal requirement to mitigate his damages by obtaining psychiatric treatment, when his refusal to undergo psychiatric treatment is a manifestation of his emotional injuries. *See Botek v. Mine Safety Appliance Corp.*, 531 Pa. 160, 611 A.2d 1174, 1176–77 (1992); *see also Browning v. United States*, 361 F.Supp. 17, 24 (E.D.Pa.1973).

We have not been made aware, nor have we found, any cases addressing the issue of whether an award of alimony can be predicated upon a spouse taking psychotropic medication to enhance the spouse's ability to work. *But cf. In re DeLaMatter v. DeLaMatter*, 151 Wis.2d 576, 445 N.W.2d 676, 681 (Ct.App.1989) ("when alcoholic spouse has refused medically recommended treatment and then claims a need for permanent maintenance because of the alcoholism, such refusal" must be considered by court).

## C.

### Analysis of Expert Testimony and Other Evidence

When a trial court conditions a spouse's right to seek a modification in alimony on the spouse's taking psychotropic

medications pursuant to the recommendation of an expert witness, the expert testimony regarding mental illness and treatment must be highly reliable and particularized to the individual whose mental health is at issue. *See Guardianship of Roe*, 421 N.E.2d at 58–59 (when evaluating an issue involving psychotropic medication of a mentally ill person, a court "must reach beyond statistical factors and general rules to see 'the complexities of the singular situation'" (quoting *Belchertown State Sch. v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 428 (1977))). Under the circumstances of this case, we find that the expert testimony relied upon by the trial court was not sufficient to support its decision. We explain.

■ In order to sustain a petition to modify alimony set by a prior judgment, the moving party must demonstrate a change in circumstances justifying modification. *See Blaine v. Blaine*, 97 Md.App. 689, 710–11, 632 A.2d 191 (1993), *aff'd*, 336 Md. 49, 646 A.2d 413 (1994). In considering a petition for modification, a trial court has discretion to determine the extent and amount of alimony, *see Levin v. Levin*, 60 Md.App. 325, 336, 482 A.2d 935 (1984), and must consider specific factors in exercising its discretion. *See* Md.Code (1984, 1999 Repl.Vol.), § 11–106 of the Family Law Article ("FL"). One of those factors is "the ability of the party seeking alimony to be wholly or partly self-supporting." FL § 11–106(b)(*l* ).

In the present case the trial court found that because appellant's mental health had not improved as expected, Mrs. Baer was unable to work more than ten hours per week. The court considered that this finding satisfied both the change in circumstances requirement, and established the present limitations on her ability to be self-supporting. We find that the evidence supports this conclusion. *See Brashier v. Brashier*, 80 Md.App. 93, 101, 560 A.2d 44, *cert. denied*, 317 Md. 542, 565 A.2d 670 (1989) (continuation of a depressive illness after a divorce can justify modifying rehabilitative alimony to become indefinite alimony).

The court then took an unusual step, one we have not seen in any reported decision, by denying appellant's relief *solely*

because she had not utilized a modality of psychotropic medication recommended by Mr. Baer's expert witness, Dr. Siebert. Although the court did not specify the exact type of drug she should have used, it gleaned from Dr. Siebert's testimony that "there are many new medicines today which do not have the after effect Mrs. Baer complains of."

Upon Mr. Baer's request, Dr. Siebert interviewed Mrs. Baer for two hours and reviewed her medical records. Dr. Siebert testified that Mrs. Baer showed no symptoms of depression, mania, anxiety, or other mental illness in her interview, and concluded that her illness was in remission. He also opined that she had no limitations on the nature or extent of her potential employment. Based on her medical records, however, Dr. Siebert concluded that Mrs. Baer was suffering from a bipolar disorder, a diagnosis differing from Mrs. Baer's psychologist, who diagnosed major depression. Dr. Siebert explained that a bipolar disorder was an "episodic disorder . . . that punctuates a person's life. . . . A functional person that will have episodes, discrete episodes of illness that will strike them down for a period of weeks to months and render that person basically disabled temporarily." With respect to Mrs. Baer he said:

[W]e can see in Ms. Baer's history that she had symptoms in college, nevertheless was able to finish college, graduate. Then she had a stretch of time where she did well again. Then she had another episode of illness that resulted in a second hospitalization prior to her earning her Ph.D.

It is apparent that she has an illness from which she has a recovery. That she will recover from the more severe aspects of it, the disabling aspects of the condition . . . . and will basically get on with her life at that point in time.

Based upon his diagnosis of a bipolar disorder, rather than major depression, as Dr. Muha diagnosed, Dr. Siebert decided that Mrs. Baer needed to take a particular type of psychotropic medication known as a "mood stabilizer." These mood stabilizing medications were appropriate, he said, because she was bipolar, and these medications "will especially lock onto a

person when they are in a normal mood and will keep them functional." He recommended that these medications should be taken along with an antidepressant medication. He acknowledged that she was already taking zoloft, an antidepressant, but believed that a higher dose of zoloft or a stronger antidepressant was appropriate. Dr. Siebert also said that she should be monitored by a psychiatrist while taking these medications and that care by a family practice physician was not sufficient.

We perceive several problems with the nature and extent of the trial court's reliance on Dr. Siebert's testimony. First, the court rested its entire ruling on Dr. Siebert's recommendation for treatment, while rejecting a major part of his diagnosis. Although the court did not say whether it agreed that Mrs. Baer was bipolar, the court implicitly rejected Dr. Siebert's opinions that Mrs. Baer was currently in remission, suffered no current depression, and had no current limitations on her working ability. Instead, the court found that she had "severe depression" which prevented her from presently working more than ten hours a week. Although the court chose not to accept Dr. Siebert's assessment of her current condition, it nonetheless adopted Dr. Siebert's recommendation that Mrs. Baer should be taking mood stabilizers.

It appeared from Dr. Siebert's testimony that bipolar disorder and major depression exhibit similar symptoms, and are often difficult to distinguish from one another.[4] Dr. Siebert

---

4. Such testimony appears to be in accordance with general understanding about these conditions. *See* Karin A. Guiduli, Comment, *Challenges for the Mentally Ill: The "Threat to Safety" Defense Standard and the Use of Psychotropic Medication Under Title I of the Americans with Disabilities Act of 1990*, 144 U. Pa. L.Rev. 1149, 1154 (1990). The Comment explains:

Four common diagnoses include major (unipolar) depression, manic-depressive (bipolar) disorder, dysthymia, and seasonal affective disorder.... Bipolar disorder differs from the other three in that the individual experiences manic episodes ('highs') in addition to depression ('lows'). Just as depression is more than a bad mood, these manic episodes are not simply a good mood or a break in the depression. Rather, mania is a euphoric state which may lead the individual to experience rushes of ideas or thoughts, grandiose no-

also indicated that the type of medication appropriate for each category of affective disorder was different, and that mood stabilizers would not be used if the diagnosis was simply major depression, rather than a bipolar disorder.[5]  By predicating its denial of further alimony on Mrs. Baer's refusal to take the mood stabilizers that Dr. Siebert recommended, the court placed total reliance on the accuracy of his diagnosis and correctness of his recommendation.  When we consider the intrusive nature of the medication recommended, and the court's rejection of a major portion of Dr. Siebert's testimony, and factor in a person's right to bodily integrity, we think that the court erred in this respect.

Consideration of the practical results of the court's decision upon Mrs. Baer sheds light on additional problems with the court's basing its decision on Dr. Siebert's recommendations. Dr. Siebert was not Mrs. Baer's treating physician.  He was engaged by Mr. Baer to give testimony as an expert witness to support his defense against any increase in alimony.  Dr. Siebert made it clear in his testimony that he "was not seeing her for purposes of recommending treatment."  If Mrs. Baer were to attempt to meet the conditions imposed by the trial court, she might go to a psychiatrist who would not diagnose her as bipolar, and therefore would not recommend mood stabilizers.  If her psychiatrist were to recommend only anti-depressants, and after taking them, she was still limited in her ability to work, the issue of modification might be *res judicata* because she would still be seeking extension of alimony based

---

tions, extreme distractibility, abundant energy, increased risk-taking, rapid talking or fidgeting, and a tendency to act irrationally and to overlook harmful or painful consequences of behavior.
*Id.* (Citations omitted).  For clinical definitions of these disorders, *see American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV) (4 th ed.1994).

5. *See* Guiduli, *supra,* at 1160–61 ("For the most common mental illnesses, psychotropic medication can be divided into four categories: antidepressants (to treat depressive disorders), antimanics (to treat bipolar disorder or manic-depressive disorder), antianxiety medication (to treat anxiety disorders) and antipsychotics (to treat schizophrenia).")

on her depression and inability to work, without taking mood stabilizers, and thus she could show no change in circumstances. *See Blaine,* 97 Md.App. at 704, 632 A.2d 191.

We further note that Mrs. Baer previously took lithium, a mood stabilizer, and experienced problems. While her testimony did not establish that she could not, with a proper dosage, be successfully medicated with a mood stabilizer, we think that her past history with the medication should be evaluated before the court conditions her claim for a modification of alimony on her taking such medications.

Timing is also a significant problem for Mrs. Baer. Under the court's order, Mrs. Baer would have only to the end of the year 2000 to obtain a new psychiatrist, take new medications, allow time for adjustment of the medications and dosages, and determine whether the new medications allow her to function well enough to work a forty-hour week. At the time of the hearing, her income was $1,796 per month, including $1,500 in alimony. At the end of the year 2000, she will lose this alimony, as well as the health insurance coverage that Mr. Baer now provides. Even if she petitions again, a hearing may not be set in the new case until well after the end of the year 2000. By that time, she may have no ability to pay for a psychiatrist or psychotropic medications, and thus be unable to fulfill the condition imposed by the court.

Major depression and bipolar disorder are illnesses that significantly limit a person's employability. *See* Karin A. Guiduli, Comment, *Challenge For The Mentally Ill: The "Threat to Safety" Defense Standard and The Use of Psychotropic Medication Under Title I of the Americans With Disabilities Act of 1990,* 144 U. Pa. L.Rev. 1149, 1155–56 (1990). These illnesses have been recognized by courts as grounds for either indefinite alimony or a modification of alimony. *See Brashier,* 80 Md.App. at 101, 560 A.2d 44 (affirming trial court's grant of indefinite alimony in light of continued psychiatric disability); *In the Matter of the Marriage of Cook and Cook,* 27 Or.App. 467, 556 P.2d 707, 709 (1976) (holding that spouse's severe depression resulting in

loss of income supported modification of spousal support); *Glover v. Glover,* 730 So.2d 218, 220–21 (Ala.Civ.App.1998) (evidence of spouse's depression caused by chemical disorder, resulting in fatigue, was sufficient for modification of alimony); *see also* FL § 11–106(b)(8) (mental condition of party is one of required considerations in determining alimony award). Employability, timing, and the cost of mental health care are all factors that contribute to our conclusion that the trial court erred in its ruling.

Appellee argues that the sole fact that Mrs. Baer's decision not to take psychotropic medications was influenced by her depression is a sufficient reason to preclude the trial court's taking into account her refusal in denying alimony. We do not go this far. It is well recognized that mental illnesses can be controlled by the use of psychotropic medications, and we think a court need not ignore the potential benefits from such medications. While a person has a right to determine what medications to take, a court can, with particularized expert testimony and a critical review of such testimony, hold a competent adult accountable for the consequences of such decision. *See DeMary,* 982 F.Supp. at 1110; *cf. Franklin,* 687 F.Supp. at 1218–19; *DeLaMatter,* 445 N.W.2d at 681 ("Just as a family member or friend can be an 'enabler' ... so also can a court by virtue of its orders which provide no incentive to the alcoholic to address the disease."). In making such decisions, a court should include in its consideration the fairness of imposing monetary consequences of the patient's refusal upon a third party.

We realize that the circumstances of the present case are unusually difficult for a trial court to resolve, and the distinctions that we have drawn are fine ones. To clarify the ramifications of our decision, we provide the following directions and suggestions for the trial court on remand.

(1) Given its finding that Mrs. Baer could not presently work more than ten hours per week, and its concern that her refusal to take psychotropic medications was unreasonable, the court should not enter a final judgment in the case based

on the present evidence. It should reserve its judgment on the indefinite alimony issue, and advise the parties that it is considering denial of indefinite alimony on the grounds of her refusal to take appropriate medication. It should, however, make an interim determination of whether a *pendente lite* modification of alimony is warranted, based on Mrs. Baer's *current* mental health and resulting work limitations, taking into account the appropriate factors under section 11–106 of the Family Law Article.

(2) On remand, the court should give consideration to the appointment of a psychiatrist as a neutral expert witness pursuant to Maryland Rule 5–706 to conduct a thorough evaluation of Mrs. Baer and her medical history, and to testify regarding the expert's findings and medical recommendations. It could also give both parties sufficient time to consult a psychiatrist regarding the use of mood stabilizing medications, and then allow them to present expert witnesses on that specific issue.[6]

### III.

### Denial of Modification on Grounds of Cancer Surgeries

In light of our directive that the court determine appropriate alimony considering Mrs. Baer's current inability to work no more than ten hours per week, we need not consider whether the court erred in refusing her an extension of alimony on the ground of her unexpected cancer surgeries. An extension of alimony for that reason also would be based on her current ability to work, and involve consideration of the same factors, under section 11–106 of the Family Law Article. Thus, consideration of this alternative reason for extension would be a repetitive analysis.

**JUDGMENT OF THE CIRCUIT COURT VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS**

---

**6.** Mr. Baer's expert should be given an appropriate opportunity to interview and evaluate Mrs. Baer.

CONSISTENT WITH THIS OPINION; COSTS TO BE
PAID BY APPELLEE.

Concurring Opinion by HARRELL, J.

HARRELL, Judge, concurring.

I write separately (not for the practice but) because I do not
see the necessity for much of the dicta in the majority opinion,
particularly those portions where, in my view, the majority
promotes as a consequence of the circuit court's ruling that
Mrs. Baer may be required to experiment with psychotropic
drugs in order to satisfy the court whether she is entitled to
modification of alimony.[7]  I also fail to see the need to include
the forced medication legal analysis set forth in the majority
opinion in order to decide this appeal.  Nevertheless, because
of the majority's identified inconsistencies between the circuit
court's reasoning in its 13 July 1998 Opinion And Order and
the evidence, I endorse the ultimate result.  I explain.

The order embodying the previously agreed upon terms of
the rehabilitative alimony award, which appellant sought to
modify or extend, was dated 1 April 1996.  The record extract
provided by the parties in this appeal does not include any
real background as to what was before the court on 1 April
1996 with regard to appellant's psychiatric or emotional condi-
tion or history [8], although we do know that her cancer surger-

---

7.  It seems to me that, in lieu of experimenting with the drugs in an
effort to satisfy the court, Mrs. Baer could seek to produce competent
expert testimony to counter Dr. Siebert's conclusions and opinions in
that regard.  Obviously, Dr. Muha, a clinical psychologist, was not such
a witness.  Moreover, a qualified expert could flesh-out Mrs. Baer's
anecdotal references to her adverse reactions to prior medication and
perhaps interpret those idiosyncratic results in terms of the known
properties of newer drugs, including the drugs discussed by Dr. Siebert.

8.  A copy is included in the record extract of the 13 November 1995
proceeding in open court where the parties' agreement was put on the
record.  Appellant's former counsel, inquiring of appellant as to her
understanding of the 5 year modifiable rehabilitative alimony compo-
nent, framed a single question to include "should your condition
worsen, you [ ] would be free to come back and ask for an increase, you
understand that?"  Other than this vague allusion, the extract in the

ies and recuperation from them occurred before entry of the foundational order. Thus, we do not know what the court's anticipation, if any, was regarding the future course or treatment of Mrs. Baer's mental illness after 1 April 1996. In the posture the instant case reaches us, however, this deficiency is not of dispositive consequence because the unchallenged conclusion of the trial judge in his 13 July 1998 Opinion And Order was "that the continuation of [appellant's] medical condition of major depression would qualify for an extension of alimony under *Brashier v. Brashier* [80 Md.App. 93, 560 A.2d 44 (1989) ]."

What sets the instant case apart from *Brashier* and *Benkin v. Benkin,* 71 Md.App. 191, 524 A.2d 789 (1987), of course, is that the ailing spouses in those cases apparently either sought generally accepted and appropriate medical treatment for the prevailing medical condition (*Benkin,* 71 Md.App. at 196, 524 A.2d 789) or were precluded from doing so, though apparently willing, by the loss of medical insurance coverage (*Brashier,* 80 Md.App. at 98, 100, 560 A.2d 44), while Mrs. Baer refuses such treatment outright. Thus, after the initial alimony award, Mrs. Brashier's severe anxiety and depression [9] (partially exacerbated by matters related to or flowing from the divorce) continued, and Mrs. Benkin's arthritis worsened. Mrs. Baer's severe depression, largely untreated in a conventional sense, also continued.

What might have supported therefore a different result in the instant case *sub judice* from that obtained in *Brashier* and *Benkin,* however, was foreclosed in the instant case by the trial court's unsupported and inconsistent conclusions based on the evidence it apparently found credible or by which it felt constrained. As the majority points out, the trial judge apparently rejected Dr. Siebert's diagnosis of bipolar disorder, in favor of Dr. Muha's identification of severe depression.

---

instant appeal casts no light on what the court may have appreciated about Mrs. Baer's "condition" at that time.

**9.** Her agoraphobia did respond favorably to treatment, however.

Yet, ignoring the implicit limitations of Dr. Siebert's drug treatment testimony regarding combining mood stabilizers with appropriate dosages of antidepressants to treat bipolar disorder, the court apparently felt constrained thereby and/or was persuaded that appellant's refusal to take mood stabilizers and certain types or dosages of antidepressants contributed to her continuing depression.[10]

Of greatest consequence to me, however, was the court's conclusion that appellant's "depression is one of the reasons she rejects these drugs." Giving full play to the trial court's superior ability to assess witness credibility and the court's broad discretion in these matters, I interpret this statement as the court concluding that appellant's mental disease or condition was a proximate cause of her refusal to seek appropriate treatment. Assuming that to be so, her condition then was inseparable from her refusal to seek treatment, and the isolation of the latter would not therefore be an appropriate or logical ground for denial of her alimony modification request. As the trial court explains its judgment, it cannot stand. Therefore, I join in the majority's result, but based on a bit leaner analysis.

I add, in closing, that the acceptance of personal responsibility for the consequences of one's voluntary and free conduct (which principle I perceive as undergirding the trial court's reasoning in this case), is a value that generally resonances with me. What I am unable to reconcile in the application of this principle in the instant appeal, however, is that the court apparently concluded that Mrs. Baer is sick and that her sickness feeds on itself to impede her maximum possible improvement. Under such circumstances, appellant's decision to refuse a particular treatment regimen cannot be deemed to be a free and voluntary decision.

---

**10.** Appellant was taking an antidepressant, zoloft, which Dr. Siebert thought was at too low a dosage. In any event, Dr. Siebert believed only a combination of antidepressants and mood stabilizers would treat adequately appellant's bipolar disorder.